# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| IN RE TRULIA, INC. STOCKHOLDER LITIGATION | CONSOLIDATED C.A. No. 10020-CB |

## OPINION

Date Submitted: October 16, 2015
Date Decided: January 22, 2016

Seth D. Rigrodsky, Brian D. Long, Gina M. Serra and Jeremy J. Riley, RIGRODSKY & LONG, P.A., Wilmington, Delaware; Peter B. Andrews and Craig J. Springer, ANDREWS & SPRINGER, LLC, Wilmington, Delaware; James R. Banko, FARUQI & FARUQI, LLP, Wilmington, Delaware; Peter Safirstein, Domenico Minerva and Elizabeth Metcalf, MORGAN & MORGAN, P.C., New York, New York; Katharine M. Ryan and Richard A. Maniskas, RYAN & MANISKAS, LLP, Wayne, Pennsylvania; Kent A. Bronson, Todd Kammerman and Christopher Schuyler, MILBERG LLP, New York, New York; Juan E. Monteverde, James Wilson, Jr. and Miles D. Schreiner, FARUQI & FARUQI, LLP, New York, New York; *Counsel for Plaintiffs.*

Rudolf Koch and Sarah A. Clark, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Deborah S. Birnbach, GOODWIN PROCTER LLP, Boston, Massachusetts; Michael T. Jones, GOODWIN PROCTER LLP, Menlo Park, California; *Attorneys for Defendants Trulia, Inc., Pete Flint, Robert Moles, Theresia Gouw, Gregory Waldorf, Sami Inkinen, Erik Bardman and Steve Hafner.*

William M. Lafferty, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Alan S. Goudiss, SHEARMAN & STERLING, New York, New York; *Attorneys for Defendants Zillow, Inc. and Zebra Holdco, Inc.*

Joseph Christensen, JOSEPH CHRISTENSEN P.A., Wilmington, Delaware; *Counsel for Amicus Curiae Sean J. Griffith.*

**BOUCHARD, C.**

This opinion concerns the proposed settlement of a stockholder class action challenging Zillow, Inc.'s acquisition of Trulia, Inc. in a stock-for-stock merger that closed in February 2015. Shortly after the public announcement of the proposed transaction, four Trulia stockholders filed essentially identical complaints alleging that Trulia's directors had breached their fiduciary duties in approving the proposed merger at an unfair exchange ratio. Less than four months later, after taking limited discovery, the parties reached an agreement-in-principle to settle.

The proposed settlement is of the type often referred to as a "disclosure settlement." It has become the most common method for quickly resolving stockholder lawsuits that are filed routinely in response to the announcement of virtually every transaction involving the acquisition of a public corporation. In essence, Trulia agreed to supplement the proxy materials disseminated to its stockholders before they voted on the proposed transaction to include some additional information that theoretically would allow the stockholders to be better informed in exercising their franchise rights. In exchange, plaintiffs dropped their motion to preliminarily enjoin the transaction and agreed to provide a release of claims on behalf of a proposed class of Trulia's stockholders. If approved, the settlement will not provide Trulia stockholders with any economic benefits. The only money that would change hands is the payment of a fee to plaintiffs' counsel.

Because a class action impacts the legal rights of absent class members, it is the responsibility of the Court of Chancery to exercise independent judgment to determine

1

whether a proposed class settlement is fair and reasonable to the affected class members. For the reasons explained in this opinion, I conclude that the terms of this proposed settlement are not fair or reasonable because none of the supplemental disclosures were material or even helpful to Trulia's stockholders, and thus the proposed settlement does not afford them any meaningful consideration to warrant providing a release of claims to the defendants. Accordingly, I decline to approve the proposed settlement.

On a broader level, this opinion discusses some of the dynamics that have led to the proliferation of disclosure settlements, noting the concerns that scholars, practitioners and members of the judiciary have expressed that these settlements rarely yield genuine benefits for stockholders and threaten the loss of potentially valuable claims that have not been investigated with rigor. I also discuss some of the particular challenges the Court faces in evaluating disclosure settlements through a non-adversarial process.

Based on these considerations, this opinion offers the Court's perspective that disclosure claims arising in deal litigation optimally should be adjudicated outside of the context of a proposed settlement so that the Court's consideration of the merits of the disclosure claims can occur in an adversarial process without the defendants' desire to obtain an often overly broad release hanging in the balance. The opinion further explains that, to the extent that litigants continue to pursue disclosure settlements, they can expect that the Court will be increasingly vigilant in scrutinizing the "give" and the "get" of such settlements to ensure that they are genuinely fair and reasonable to the absent class members.

## I. BACKGROUND

The facts recited in this opinion are based on the allegations of the Verified Amended Class Action Complaint in C.A. No. 10022-CB, which was designated as the operative complaint in the consolidation action; the brief plaintiffs submitted in support of their motion for a preliminary injunction; and the briefs and affidavits submitted in connection with the proposed settlement. Because of the posture of the litigation, the recited facts do not represent factual findings, but rather the record as it was presented for the Court to evaluate the proposed settlement.

### A. The Parties

Defendant Trulia, Inc., a Delaware corporation, is an online provider of information on homes for purchase or for rent in the United States. Individual defendants Pete Flint, Robert Moles, Theresia Gouw, Gregory Waldorf, Sami Inkinen, Erik Bardman, and Steve Hafner were members of Trulia's board of directors when the merger was approved.

Defendant Zillow, Inc., a Washington corporation, is a real estate marketplace that helps home buyers, sellers, landlords and others find and share information about homes. Defendant Zebra Holdco, Inc. ("Holdco"), now known as Zillow Group, Inc., is a Washington corporation that was formed to facilitate the merger at issue and is now the parent company of Zillow and Trulia.

Plaintiffs Christopher Shue, Matthew Sciabacucci, Chaile Steinberg, and Robert Collier were Trulia stockholders at all times relevant to this action.

### B. The Announcement of the Merger and the Litigation

On July 28, 2014, Trulia and Zillow announced that they had entered into a definitive merger agreement under which Zillow would acquire Trulia for approximately $3.5 billion in stock.[1] The transaction was structured to include two successive stock-for-stock mergers whereby separate subsidiaries of Holdco would acquire both Trulia and Zillow. After these mergers, Trulia and Zillow would exist as wholly-owned subsidiaries of Holdco, and the former stockholders of Trulia and Zillow would receive, respectively, approximately 33% and 67% of the outstanding shares of Holdco.

After the merger was announced, the four plaintiffs filed class action complaints challenging the Trulia merger and seeking to enjoin it. Each of the complaints alleged essentially identical claims: that the individual defendants had breached their fiduciary duties, and that Zillow, Trulia, and Holdco aided and abetted those breaches.

On September 11, 2014, Holdco filed a registration statement containing Trulia and Zillow's preliminary joint proxy statement with the United States Securities and Exchange Commission. On September 24, 2014, one of the four plaintiffs filed a motion for expedited proceedings and for a preliminary injunction.

On October 13, 2014, the Court granted an unopposed motion to consolidate the four cases into one action and to appoint lead counsel. On October 14, at 10:37 a.m.,

---

[1] By closing, the transaction value had fallen to $2.5 billion, based on the value of Zillow stock at the time. *See Zillow Completes Acquisition of Trulia for $2.5 Billion in Stock; Forms "Zillow Group" Family of Brands*, (Feb. 17, 2015), *available at* http://zillow.mediaroom.com/2015-02-17-Zillow-Completes-Acquisition-of-Trulia-for-2-5-Billion-in-Stock-Forms-Zillow-Group-Family-of-Brands.

plaintiffs filed a motion to expedite the proceedings in the newly consolidated case. The Court never heard the motion, however, because the parties promptly agreed on an expedited schedule, which they documented in a stipulated case schedule filed on October 14 at 12:12 p.m., less than two hours after the motion to expedite was filed.

Over the next few weeks, plaintiffs reviewed documents produced by defendants and deposed one director of Trulia (Chairman, CEO, and co-founder Pete Flint) and a banker from J.P. Morgan Securities LLC, Trulia's financial advisor in the transaction.

On November 14, 2014, plaintiffs filed a brief in support of their motion for a preliminary injunction. In that brief, plaintiffs asserted that the individual defendants had breached their fiduciary duties by "failing to obtain the highest exchange ratio available for the Company's stockholders in a single-bidder process, failing to properly value the Company, agreeing to preclusive provisions in the Merger Agreement that impede the Board's ability to consider and accept superior proposals, and disseminating materially false and misleading disclosures to the Company's stockholders . . . ."[2] The discussion of the merits in that brief, however, focused only on disclosure issues. Plaintiffs provided no argument in support of any other aspect of their claims.

On November 17, Trulia and Zillow filed a definitive joint proxy statement regarding the transaction on Schedule 14A (the "Proxy").

---

[2] Pls.' Op. Br. Supp. Mot. Prelim. Inj. 2.

5

### C.     The Parties Reach a Settlement

On November 19, 2014, the parties entered into a Memorandum of Understanding detailing an agreement-in-principle to settle the litigation for certain disclosures to supplement those contained in the Proxy, subject to confirmatory discovery. The same day, Trulia filed a Form 8-K with the Securities and Exchange Commission containing the disclosures (the "Supplemental Disclosures").

On December 18, 2014, Trulia and Zillow held special meetings of stockholders at which each company's stockholders voted on and approved the transaction. Trulia's stockholders overwhelmingly supported the transaction. Of the Trulia shares that voted, 99.15% voted in favor of the transaction. In absolute terms, 79.52% of Trulia's outstanding shares voted in favor the transaction.[3]

On February 10, 2015, plaintiffs conducted a confirmatory deposition of a second Trulia director, Gregory Waldorf. On February 17, 2015, the transaction closed.

On June 10, 2015, the parties executed a Stipulation and Agreement of Compromise, Settlement, and Release (the "Stipulation") in support of a proposed settlement reiterating the terms of the Memorandum of Understanding. In the Stipulation, the parties agreed to seek certification of a class consisting of all Trulia stockholders from July 28, 2014 (when the transaction was announced) through February 17, 2015 (when the transaction closed). The Stipulation included an extremely broad release

---

[3] Trulia, Inc., Current Report (Form 8-K) (Dec. 18, 2014).

encompassing, among other things, "Unknown Claims"[4] and claims "arising under federal, state, foreign, statutory, regulatory, common law or other law or rule" held by any member of the proposed class relating in any conceivable way to the transaction.[5] The Stipulation further provided that plaintiffs' counsel intended to seek an award of attorneys' fees and expenses not to exceed $375,000, which defendants agreed not to oppose.

Beginning on July 17, 2015, Trulia disseminated notices to the proposed class members in accordance with a scheduling order the Court had entered.

### D.    Procedural Posture

On September 16, 2015, after receiving a brief and an affidavit from plaintiffs advocating for approval of the proposed settlement, I held a hearing to consider the fairness of the terms of the proposed settlement. Defendants made no submissions concerning the proposed settlement before the hearing, and no stockholder filed an objection to it. After the hearing, I took the request to approve the settlement under advisement and asked the parties for supplemental briefing on whether disclosures must meet the legal standard of materiality in order to constitute an adequate benefit to support

---

[4] "Unknown Claims" were defined as "any claim that a releasing person does not know or suspect exists in his, her or its favor at the time of the release of the Released Claims as against the Released Persons, and at the time of Defendants' release of Plaintiffs, each and all Class Members, and all Plaintiffs' counsel from all claims as set forth in Paragraph 9, including without limitation those claims which, if known, might have affected the decision to enter into the Settlement." Stipulation ¶ 10.

[5] Stipulation ¶ 8.

a settlement, and on the rationale and justification for including "unknown claims" among the claims that would be released by the proposed settlement.

On September 22, 2015, Sean J. Griffith, a professor at Fordham University School of Law who has researched disclosure settlements and objected to them in the past,[6] requested permission to appear as *amicus curiae* in order to submit a brief on the topics for which I requested supplemental briefing. I approved this request on September 23, and the parties submitted their supplemental briefing on October 16.

Along with their supplemental briefing, plaintiffs submitted an affidavit from Timothy J. Meinhart, a managing director of Willamette Management Associates, which provides business valuation and transaction financial advisory services. The affidavit addresses certain concerns about some (but not all) of the disclosures that I raised at the settlement hearing. Plaintiffs and defendants also informed the Court that, following the hearing, the parties had agreed to a revised stipulation with a narrower release.

Specifically, the parties removed "Unknown Claims" and "foreign" claims from the ambit of the release and added a carve-out so that the release would not cover "any claims that arise under the Hart-Scott-Rodino, Sherman, or Clayton Acts, or any other state or federal antitrust law." As revised, the release still encompasses "any claims arising under federal, state, statutory, regulatory, common law, or other law or rule" held by any member of the proposed class relating in any conceivable way to the transaction,

---

[6] *See In re Riverbed Tech.*, 2015 WL 5458041, at *2.

8

with the exception of the carve-out for claims arising under state and federal antitrust law.[7]

## II.    LEGAL ANALYSIS

### A.    Legal Standard

Under Court of Chancery Rule 23, the Court must approve the dismissal or settlement of a class action.[8]  Although Delaware has long favored the voluntary settlement of litigation,[9] the fiduciary character of a class action requires the Court to independently examine the fairness of a class action settlement before approving it.[10] "Approval of a class action settlement requires more than a cursory scrutiny by the court of the issues presented."[11]  The Court must exercise its own judgment to determine whether the settlement is reasonable and intrinsically fair.[12]  In doing so, the Court evaluates not only the claim, possible defenses, and obstacles to its successful

---

[7] Revised Proposed Order and Final J., Oct. 16, 2015.

[8] *See* Ct. Ch. R. 23(e).  Court of Chancery Rule 23.1(c) similarly requires Court approval of the dismissal or settlement of derivative actions.

[9] *Rome v. Archer*, 197 A.2d 49, 53 (Del. 1964).

[10] *Kahn v. Sullivan*, 594 A.2d 48, 58 (Del. 1991).

[11] *Rome v. Archer*, 197 A.2d at 53.

[12] *Id.*

prosecution,[13] but also "the reasonableness of the 'give' and the 'get,'"[14] or what the class members receive in exchange for ending the litigation.

Before turning to that analysis here, I pause to discuss some of the dynamics that have led to the proliferation of disclosure settlements[15] and the concerns that have been expressed about this phenomenon, and to offer the Court's perspective on how disclosure claims in deal litigation should be adjudicated in the future.

## B.   Considerations Involving Disclosure Claims in Deal Litigation

Over two decades ago, Chancellor Allen famously remarked in *Solomon v. Pathe Communications Corporation* that "[i]t is a fact evident to all of those who are familiar with shareholder litigation that surviving a motion to dismiss means, as a practical matter, that economical[ly] rational defendants . . . will settle such claims, often for a peppercorn and a fee."[16]  The Chancellor's remarks were not made in the context of a settlement, but

---

[13] *See id.*

[14] *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1043 (Del. Ch. 2015).

[15] In this Opinion, I use the term "disclosure settlement" to refer to settlements in which the sole or predominant consideration provided to stockholders in exchange for releasing their claims is the dissemination of one or more disclosures to supplement the proxy materials distributed for the purpose of soliciting stockholder approval for a proposed transaction.  An example of a disclosure settlement in which the supplemental disclosures would be the predominant but not sole consideration is one that, in addition to supplemental disclosures, includes an insubstantial component of other non-monetary consideration, such as a minor modification to a deal protection measure.

[16] 1995 WL 250374, at *4 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del. 1996).

10

they touch upon some of the same dynamics that have fueled disclosure settlements of deal litigation.

Today, the public announcement of virtually every transaction involving the acquisition of a public corporation provokes a flurry of class action lawsuits alleging that the target's directors breached their fiduciary duties by agreeing to sell the corporation for an unfair price. On occasion, although it is relatively infrequent, such litigation has generated meaningful economic benefits for stockholders when, for example, the integrity of a sales process has been corrupted by conflicts of interest on the part of corporate fiduciaries or their advisors.[17] But far too often such litigation serves no useful purpose for stockholders. Instead, it serves only to generate fees for certain lawyers who are regular players in the enterprise of routinely filing hastily drafted complaints on behalf of

---

[17] Some examples of adjudicated cases of this type arising from acquisitions of public corporations include: *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 263 (Del. Ch. 2014) (finding after trial that class suffered damages of $91 million, of which the board's financial advisor was liable for 83%, based on aiding and abetting fiduciary breaches in sale of corporation), *aff'd sub nom. RBC Capital Mkts., LLC v. Jervis*, – A.3d –, 2015 WL 7721882 (Del. Nov. 30, 2015); *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *47 (Del. Ch. Aug. 27, 2015) (finding after trial that certain directors were liable for $148 million in damages, based on fiduciary breaches in going-private transaction); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *43 (Del. Ch. May 3, 2004) (finding after trial that certain defendants were liable to stockholders for damages of $27.80 per share for fiduciary breaches in going-private transaction). *See also In re Jefferies Grp., Inc. S'holders Litig.*, 2015 WL 1414350 (Del. Ch. Mar. 26, 2015) (ORDER) (approving settlement for $70 million (net of attorneys' fees) to resolve allegations involving conflicts of interest in the sale of Jefferies Group to Leucadia National Corporation); *In re Del Monte Foods Co. S'holder Litig.*, Cons. C.A. No. 6027-VCL (Del. Ch. Dec. 1, 2011) (ORDER) (approving $89 million settlement of stockholder suit alleging fiduciary duty violations in connection with leveraged buy-out).

stockholders on the heels of the public announcement of a deal and settling quickly on terms that yield no monetary compensation to the stockholders they represent.

In such lawsuits, plaintiffs' leverage is the threat of an injunction to prevent a transaction from closing. Faced with that threat, defendants are incentivized to settle quickly in order to mitigate the considerable expense of litigation and the distraction it entails, to achieve closing certainty, and to obtain broad releases as a form of "deal insurance." These incentives are so potent that many defendants self-expedite the litigation by volunteering to produce "core documents" to plaintiffs' counsel, obviating the need for plaintiffs to seek the Court's permission to expedite the proceedings in aid of a preliminary injunction application and thereby avoiding the only gating mechanism (albeit one friendly to plaintiffs[18]) the Court has to screen out frivolous cases and to ensure that its limited resources are used wisely.[19]

---

[18] Stockholder plaintiffs who seek expedition benefit from the most favorable standard available under our law for assessing the merits of a claim—"colorability"—and from the sensible policy of this Court to attempt to resolve disclosure claims before stockholders are asked to vote. *See Ortsman v. Green*, 2007 WL 702475, at \*2 (Del. Ch. Feb. 28, 2007) (granting expedited proceedings because disclosure claims were "colorable" and "[o]nly by remedying proxy deficiencies in advance of a vote can irreparable harm be avoided"); *Morton v. Am. Mktg. Indus. Hldgs., Inc.*, 1995 WL 1791090, at \*2-4 (Del. Ch. Oct. 5, 1995) (granting expedition because colorability finding did not require a determination of merits or even legal sufficiency of pleadings, and disclosures must be made before stockholder vote rather than after the fact).

[19] Notwithstanding the plaintiff-friendly pleading standard governing a motion to expedite, the Court takes seriously its role to deny expedition in deal litigation when warranted. *See, e.g.*, *In re Rite Aid Corp. S'holders Litig.*, Cons. C.A. No. 11663-CB, at 78-92 (Del. Ch. Jan. 5, 2016) (TRANSCRIPT) (denying motion to expedite); *Sheet Metal Workers Local No. 33 Cleveland Dist. Pension Plan v. URS Corp.*, C.A. No. 9999-CB, at 47-56 (Del. Ch. Aug. 28, 2014) (TRANSCRIPT) (same); *In re Zalicus Inc. S'holder*

Once the litigation is on an expedited track and the prospect of an injunction hearing looms, the most common currency used to procure a settlement is the issuance of supplemental disclosures to the target's stockholders before they are asked to vote on the proposed transaction. The theory behind making these disclosures is that, by having the additional information, stockholders will be better informed when exercising their franchise rights.[20] Given the Court's historical practice of approving disclosure settlements when the additional information is not material, and indeed may be of only minor value to the stockholders,[21] providing supplemental disclosures is a particularly easy "give" for defendants to make in exchange for a release.

Once an agreement-in-principle is struck to settle for supplemental disclosures, the litigation takes on an entirely different, non-adversarial character. Both sides of the caption then share the same interest in obtaining the Court's approval of the settlement.[22] The next step, after notice has been provided to the stockholders, is a hearing in which the

---

*Litig.*, Cons. C.A. No. 9602-CB, at 100-11 (Del. Ch. Jun. 13, 2014) (TRANSCRIPT) (same).

[20] *See In re Riverbed Tech.*, 2015 WL 5458041, at *4.

[21] *See, e.g.*, *id.* at *5 (finding that "a positive result of small therapeutic value to the Class . . . can support . . . a settlement, but only where what is given up is of minimal value"); *In re Dr. Pepper/Seven Up Cos., Inc. S'holders Litig.*, 1996 WL 74214, at *4 (Del. Ch. Feb. 9, 1996) ("[E]ven a meager settlement that affords some benefit for stockholders is adequate to support its approval."), *aff'd*, 683 A.2d 58 (Del. 1996) (TABLE).

[22] *See Ginsburg v. Phila. Stock Exch., Inc.*, 2007 WL 2982238, at *1 (Del. Ch. Oct. 9, 2007) ("When parties have reached a negotiated settlement, the litigation enters a new and unusual phase where former adversaries join forces to convince the court that their settlement is fair and appropriate.").

13

Court must evaluate the fairness of the proposed settlement. Significantly, in advance of such hearings, the Court receives briefs and affidavits from plaintiffs extolling the value of the supplemental disclosures and advocating for approval of the proposed settlement, but rarely receives any submissions expressing an opposing viewpoint.[23]

Although the Court commonly evaluates the proposed settlement of stockholder class and derivative actions without the benefit of hearing opposing viewpoints, disclosure settlements present some unique challenges. It is one thing for the Court to judge the fairness of a settlement, even in a non-adversarial context, when there has been significant discovery or meaningful motion practice to inform the Court's evaluation. It is quite another to do so when little or no motion practice has occurred and the discovery record is sparse, as is typically the case in an expedited deal litigation leading to an equally expedited resolution based on supplemental disclosures before the transaction closes. In this case, for example, no motions were decided (not even a motion to expedite), and discovery was limited to the production of less than 3,000 pages of

[23] *See In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 961 (Del. Ch. 1996) (Allen, C.) ("[I]n most instances, the court is constrained by the absence of a truly adversarial process, since inevitably both sides support the settlement and legally assisted objectors are rare."); Browning Jeffries, *The Plaintiffs' Lawyer's Transaction Tax: The New Cost of Doing Business in Public Company Deals*, 11 Berkeley Bus. L.J. 55, 59, 89 (2014) ("[D]ue to the agency costs involved in class action litigation and the lack of motivation of any one plaintiff shareholder to monitor class counsel, these fee awards are rarely objected to . . . ."). In the rare case in which objectors are present, the question necessarily becomes whether the objectors represent the interests of the class or instead represent yet another set of interests. *See* Sean J. Griffith & Alexandra D. Lahav, *The Market for Preclusion in Merger Litigation*, 66 Vand. L. Rev. 1053, 1084 n.142, 1122 (2013) (noting that in some cases objectors may also be hold-outs demanding a piece of the settlement value).

documents and the taking of three depositions, two of which were taken before the parties agreed in principle to settle and one of which was a "confirmatory" deposition taken thereafter.[24]

The lack of an adversarial process often requires that the Court become essentially a forensic examiner of proxy materials so that it can play devil's advocate in probing the value of the "get" for stockholders in a proposed disclosure settlement. Consider the following example. During discovery, plaintiffs will typically receive copies of board presentations made by financial advisors who ultimately opine on the fairness of the transaction from a financial point of view. It is all too common for a plaintiff to identify and obtain supplemental disclosure of a laundry list of minutiae in a financial advisor's board presentation that does not appear in the summary of the advisor's analysis in the proxy materials—summaries that commonly run ten or more single-spaced pages in the first instance. Given that the newly added pieces of information were, by definition, missing from the original proxy, it is not difficult for an advocate to make a superficially

---

[24] "Confirmatory" discovery is discovery taken after an agreement-in-principle to settle a case has been reached. Theoretically, it is an opportunity for plaintiffs' counsel to "confirm" that the settlement terms are reasonable—that is, to probe further the strengths and weaknesses of the claims relative to the consideration for the proposed settlement. In reality, given that plaintiffs' counsel already have resigned themselves to settle on certain terms, confirmatory discovery rarely leads to a renunciation of the proposed settlement and, instead, engenders activity more reflective of "going through the motions." *See Brinckerhoff v. Tex. E. Prods. Pipeline Co., LLC*, 986 A.2d 370, 385 (Del. Ch. 2010) (questioning quality of confirmatory discovery process) ("Confirmatory discovery performances ranging from the diffident to the feckless impair, rather than inspire, judicial confidence."); *In re Coleman Co., Inc. S'holders Litig.*, 750 A.2d 1202, 1212 (Del. Ch. 1999) ("[C]onfirmatory discovery in settlement situations is hardly the equivalent of adversarial pre-trial discovery.").

persuasive argument that it is better for stockholders to have more information rather than less. In an adversarial process, defendants, armed with the help of their financial advisors, would be quick to contextualize the omissions and point out why the missing details are immaterial (and may even be unhelpful) given the summary of the advisor's analysis already disclosed in the proxy. In the settlement context, however, it falls to law-trained judges to attempt to perform this function, however crudely, as best they can.

It is beyond doubt in my view that the dynamics described above, in particular the Court's willingness in the past to approve disclosure settlements of marginal value and to routinely grant broad releases to defendants and six-figure fees to plaintiffs' counsel in the process,[25] have caused deal litigation to explode in the United States beyond the realm of reason. In just the past decade, the percentage of transactions of $100 million or more that have triggered stockholder litigation in this country has more than doubled, from 39.3% in 2005 to a peak of 94.9% in 2014.[26] Only recently has the percentage decreased, falling to 87.7% in 2015 due to a decline near the end of the year.[27] In Delaware, the percentage of such cases settled solely on the basis of supplemental disclosures grew

---

[25] *See In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1135-43 (Del. Ch. 2011) (discussing disclosure settlements and compiling fee awards in various disclosure-only cases).

[26] Matthew D. Cain & Steven Davidoff Solomon, *Takeover Litigation in 2015* 2 (Jan. 14, 2016), *available at* http://ssrn.com/abstract=2715890. The sample consists of transactions of at least $100 million with publicly traded targets, and includes both Delaware and non-Delaware corporations. Figures for 2015 are preliminary.

[27] *See id.* at 2-3.

significantly from 45.4% in 2005 to a high of 76.0% in 2012, and only recently has seen some decline.[28] The increased prevalence of deal litigation and disclosure settlements has drawn the attention of academics, practitioners, and the judiciary.

Scholars have criticized disclosure settlements, arguing that non-material supplemental disclosures provide no benefit to stockholders and amount to little more than deal "rents" or "taxes," while the liability releases that accompany settlements threaten the loss of potentially valuable claims related to the transaction in question or other matters falling within the literal scope of overly broad releases.[29] One recent study

---

[28] *See id.* at 6. The percentage of settlements in Delaware based solely on supplemental disclosures was 63.6% in 2013 and 70.6% in 2014. Figures for 2015 appear to be too preliminary to be meaningful.

[29] *See generally* Jill E. Fisch, Sean J. Griffith & Steven Davidoff Solomon, *Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*, 93 Tex. L. Rev. 557 (2015) (proposing that state courts reject disclosure settlements and shift disclosure policing to the federal securities laws). *See also* J. Travis Laster, *A Milder Prescription for the Peppercorn Settlement Problem in Merger Litigation*, 93 Tex. L. Rev. See Also 129 (2015) (responding to the Fisch, Griffith & Solomon article, acknowledging similar concerns regarding disclosure settlements, and proposing solutions involving greater judicial scrutiny of claims at motion to expedite stage); Matthew D. Cain & Steven Davidoff Solomon, *A Great Game: The Dynamics of State Competition and Litigation*, 100 Iowa L. Rev. 465 (2015) (examining merger litigation data and theorizing that states seeking to attract corporate litigation award higher fees and dismiss fewer cases); Jeffries, *supra* note 23 (criticizing disclosure-only settlements and suggesting legislative responses); Griffith & Lahav, *supra* note 23 (discussing the value for defendants of receiving release through disclosure-only settlements and the potential usefulness of multi-jurisdiction litigation). *But see* Phillip R. Sumpter, *Adjusting Attorneys' Fee Awards: The Delaware Court of Chancery's Answer to Incentivizing Meritorious Disclosure-Only Settlements*, 15 U. Pa. J. Bus. L. 669 (2013) (arguing that disclosure-only settlements can have value and discussing the concept of awarding of varying levels of fees to encourage or discourage different types of disclosure settlements).

17

provides empirical data suggesting that supplemental disclosures make no difference in stockholder voting, and thus provide no benefit that could serve as consideration for a settlement.[30] Another paper, written by a practitioner, provides examples of cases in which unexplored but valuable claims that almost were released through disclosure settlements later yielded significant recoveries for stockholders.[31] A particularly vivid example is the recently concluded *Rural/Metro* case.[32] In that case, the Court of Chancery initially considered it a "very close call"[33] to reject a disclosure settlement that would have released claims which subsequently yielded stockholders over $100 million, mostly from a post-trial judgment, after new counsel took over the case.[34]

Members of this Court also have voiced their concerns over the deal settlement process, expressing doubts about the value of relief obtained in disclosure settlements, and explaining their reservations over the breadth of the releases sought and the lack of

---

[30] Fisch, Griffith & Solomon, *supra* note 29, at 582-87.

[31] *See generally* Joel Edan Friedlander, *How* Rural/Metro *Exposes the Systemic Problem of Disclosure Settlements* (U. Pa. L. Sch. Inst. for L. and Econ. Res. Paper No. 15-40, Draft Dec. 17, 2015), *available at* http://ssrn.com/abstract=2689877.

[32] *In re Rural/Metro Corp.*, 102 A.3d 205, *aff'd sub nom. RBC Capital Mkts., LLC v. Jervis*, – A.3d –, 2015 WL 7721882 (Del. Nov. 30, 2015).

[33] *In re Rural/Metro Corp. S'holders Litig.*, Cons. C.A. No. 6350-VCL, at 134 (Del. Ch. Jan. 17, 2012) (TRANSCRIPT).

[34] *See Friedlander*, *supra* note 31, at 16-22. The paper also examines litigation over the sale of Prime Hospitality Corporation, which settled for $25 million after a disclosure settlement was rejected and new counsel was appointed to litigate the case. *See id.* at 11-14.

any meaningful investigation of claims proposed to be released.[35] Judges outside of Delaware have expressed similar concerns.[36]

Given the rapid proliferation and current ubiquity of deal litigation, the mounting evidence that supplemental disclosures rarely yield genuine benefits for stockholders, the risk of stockholders losing potentially valuable claims that have not been investigated with rigor, and the challenges of assessing disclosure claims in a non-adversarial settlement process, the Court's historical predisposition toward approving disclosure settlements needs to be reexamined. In the Court's opinion, the optimal means by which disclosure claims in deal litigation should be adjudicated is outside the context of a

---

[35] *See, e.g.*, *Acevedo v. Aeroflex Hldg. Corp.*, C.A. No. 9730-VCL, at 60-79 (Del. Ch. July 8, 2015) (TRANSCRIPT) (rejecting settlement because relief obtained was insufficient to support a broad release, and giving the option to reapply with a release tailored only to the Delaware disclosure and fiduciary claims investigated by plaintiffs); *In re Riverbed Tech.*, 2015 WL 5458041, at *3-6 (approving settlement, but expressing concerns over agency problems, lack of adversarial presentation, limited benefit conferred by disclosures, and noting that broad releases may not be approved going forward); *In re Intermune, Inc. S'holder Litig.*, C.A. No. 10086-VCN (Del. Ch. July 8, 2015) (TRANSCRIPT) (deferring decision on a disclosure settlement and questioning whether the releases should be limited only to disclosure claims) (settlement later approved in C.A. No. 10086-VCN (Del. Ch. Dec. 29, 2015) (TRANSCRIPT)); *In re TW Telecom, Inc. S'holders Litig.*, C.A. No. 9845-CB (Del. Ch. Aug. 20, 2015) (TRANSCRIPT) (approving a settlement "somewhat reluctantly" while opining that settlements going forward will receive more scrutiny and that all but one disclosure obtained had "no consequential value").

[36] *See, e.g.*, *In re Allied Healthcare S'holder Litig.*, 2015 WL 6499467, at *2 (N.Y. Sup. Ct. Oct. 23, 2015) (rejecting a settlement and expressing concern that "in the area of derivative litigation, a culture has developed that results in cases of relatively worthless settlements (derivative actions are rarely tried to a verdict) that discontinue the action (with releases) resulting in the corporate defendants not opposing an agreed upon legal fee to class counsel"); *City Trading Fund v. Nye*, 2015 WL 93894 (N.Y. Sup. Ct. Jan. 7, 2015) (rejecting a settlement the court regarded as exceptionally frivolous and noting that the nature of "merger tax suits" incentivizes settlement regardless of a case's frivolity).

19

proposed settlement so that the Court's consideration of the merits of the disclosure claims can occur in an adversarial process where the defendants' desire to obtain a release does not hang in the balance.

Outside the settlement context, disclosure claims may be subjected to judicial review in at least two ways. One is in the context of a preliminary injunction motion, in which case the adversarial process would remain intact and plaintiffs would have the burden to demonstrate on the merits a reasonable likelihood of proving that "the alleged omission or misrepresentation is material."[37] In other words, plaintiffs would bear the burden of showing "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[38]

A second way is when plaintiffs' counsel apply to the Court for an award of attorneys' fees after defendants voluntarily decide to supplement their proxy materials by making one or more of the disclosures sought by plaintiffs, thereby mooting some or all of their claims. In that scenario, where securing a release is not at issue, defendants are incentivized to oppose fee requests they view as excessive.[39] Hence, the adversarial

---

[37] *Gantler v. Stephens*, 965 A.2d 695, 710 (Del. 2009).

[38] *Id.* (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994)).

[39] If defendants do not oppose a mootness fee application, then the Court presumably would not have the benefit of any opposing position when considering the application unless an objector appeared. But, in that case, the Court would have some indication of the reasonableness of the fee request.

process would remain in place and assist the Court in its evaluation of the nature of the benefit conferred (*i.e.*, the value of the supplemental disclosures) for purposes of determining the reasonableness of the requested fee.

In either of these scenarios, to the extent fiduciary duty claims challenging the sales process remain in the case, they may be amenable to dismissal. Harkening back to Chancellor Allen's words in *Solomon*, the Court would be cognizant of the need to "apply the pleading test under Rule 12 with special care" in stockholder litigation because "the risk of strike suits means that too much turns on the mere survival of the complaint."[40] In that regard, both the litigants and the Court are aided today by thirty years of jurisprudence that now exists interpreting the principles enunciated in *Unocal* and *Revlon* that often are central to reviewing fiduciary conduct in deal litigation.[41]

The preferred scenario of a mootness dismissal appears to be catching on. In the wake of the Court's increasing scrutiny of disclosure settlements, the Court has observed

---

[40] 1995 WL 250374, at *4.

[41] That jurisprudence includes the Delaware Supreme Court's recent express confirmation that "the business judgment rule is invoked as the appropriate standard of review for a post-closing damages action when a merger that is not subject to the entire fairness standard of review has been approved by a fully informed, uncoerced majority of the disinterested stockholders." *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 305-06 (Del. 2015).

In this case, because the disputed transaction involved a stock-for-stock merger of widely held, publicly traded corporations, plaintiffs' claims presumably would not benefit from the enhanced scrutiny of *Revlon* and instead would need to overcome the business judgment presumption. *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 46-47 (Del. 1994) (quoting *Paramount Commc'ns Inc. v. Time Inc.*, 1989 WL 79880, at *23 (Del. Ch. July 14, 1989), *aff'd*, 571 A.2d 1140 (Del. 1989)).

21

an increase in the filing of stipulations in which, after disclosure claims have been mooted by defendants electing to supplement their proxy materials, plaintiffs dismiss their actions without prejudice to the other members of the putative class (which has not yet been certified) and the Court reserves jurisdiction solely to hear a mootness fee application.[42] From the Court's perspective, this arrangement provides a logical and sensible framework for concluding the litigation. After being afforded some discovery to probe the merits of a fiduciary challenge to the substance of the board's decision to approve the transaction in question, plaintiffs can exit the litigation without needing to expend additional resources (or causing the Court and other parties to expend further resources) on dismissal motion practice after the transaction has closed. Although defendants will not have obtained a formal release, the filing of a stipulation of dismissal likely represents the end of fiduciary challenges over the transaction as a practical matter.

In the mootness fee scenario, the parties also have the option to resolve the fee application privately without obtaining Court approval. Twenty years ago, Chancellor Allen acknowledged the right of a corporation's directors to exercise business judgment to expend corporate funds (typically funds of the acquirer, who assumes the expense of defending the litigation after the transaction closes) to resolve an application for

---

[42] *See, e.g.*, *In re Family Dollar Stores, Inc. S'holder Litig.*, C.A. No. 9985-CB (Del. Ch. Aug. 4, 2015) (ORDER) (dismissing case with prejudice to plaintiffs and without prejudice to class, where supplemental disclosures had mooted certain claims, and setting schedule for mootness fee application); *In re Zalicus, Inc. S'holder Litig.*, C.A. No. 9602-CB (Del. Ch. Nov. 12, 2014) (ORDER) (dismissing action without prejudice after defendants had mooted certain disclosure claims, and setting schedule for mootness fee application).

attorneys' fees when the litigation has become moot, with the caveat that notice must be provided to the stockholders to protect against "the risk of buy off" of plaintiffs' counsel.[43] As the Court recently stated, "notice is appropriate because it provides the information necessary for an interested person to object to the use of corporate funds, such as by 'challeng[ing] the fee payment as waste in a separate litigation,' if the circumstances warrant."[44] In other words, notice to stockholders is designed to guard against potential abuses in the private resolution of fee demands for mooted representative actions. With that protection in place, the Court has accommodated the use of the private resolution procedure on several recent occasions and reiterates here the propriety of proceeding in that fashion.[45]

Returning to the historically trodden but suboptimal path of seeking to resolve disclosure claims in deal litigation through a Court-approved settlement, practitioners should expect that the Court will continue to be increasingly vigilant in applying its independent judgment to its case-by-case assessment of the reasonableness of the "give"

---

[43] *In re Advanced Mammography Sys., Inc. S'holders Litig.*, 1996 WL 633409, at *1 (Del. Ch. Oct. 30, 1996); *see also In re Cellular Commc'ns Int'l, Inc. S'holders Litig.*, 752 A.2d 1185, 1188 (Del. Ch. 2000).

[44] *In re Zalicus, Inc. S'holders Litig.*, 2015 WL 226109, at *2 (Del. Ch. Jan. 16, 2015) (quoting *Hack v. Learning Co.*, 1996 WL 633306, at *2 (Del. Ch. Oct. 29, 1996)).

[45] *See, e.g.*, *Swomley v. Schlecht*, 2015 WL 1186126, at *1-2 (Del. Ch. Mar. 12, 2015) (setting forth class notice procedure for mootness fee, after defendants mooted certain disclosure claims and successfully moved to dismiss rest of case); *In re Zalicus*, 2015 WL 226109, at *1-2 (supporting private mootness fee resolution procedure while requiring that adequate notice be provided to stockholders); *Astex Pharm., Inc. S'holders Litig.*, 2014 WL 4180342, at *1-2 (Del. Ch. Aug. 25, 2014) (same).

and "get" of such settlements in light of the concerns discussed above. To be more specific, practitioners should expect that disclosure settlements are likely to be met with continued disfavor in the future unless the supplemental disclosures address a plainly material misrepresentation or omission, and the subject matter of the proposed release is narrowly circumscribed to encompass nothing more than disclosure claims and fiduciary duty claims concerning the sale process, if the record shows that such claims have been investigated sufficiently.[46] In using the term "plainly material," I mean that it should not be a close call that the supplemental information is material as that term is defined under Delaware law. Where the supplemental information is not plainly material, it may be appropriate for the Court to appoint an *amicus curiae* to assist the Court in its evaluation of the alleged benefits of the supplemental disclosures, given the challenges posed by the non-adversarial nature of the typical disclosure settlement hearing.[47]

---

[46] In contrast to the settlement context, the Court does not need to weigh the "get" of the supplemental disclosures against the "give" of a release when determining whether to grant an award of fees in the mootness fee scenario discussed above. Accordingly, an award of fees in the mootness fee scenario may be appropriate for supplemental disclosures of less significance than would be necessary to sustain approval of a settlement. The amount of the fee in the mootness scenario, however, would be commensurate with the value of the benefit conferred. Thus, for example, a supplemental disclosure of nominal value would warrant only a nominal fee award.

[47] *See Hoffman v. Dann*, 205 A.2d 343, 345 (Del. 1964) (noting that "the Chancellor appointed an *amicus curiae* to report to him on the relevant issues to be tendered at the hearing on the proposed settlement, and as to proof which would be of assistance to him in passing on the fairness of the settlement."). The costs of the *amicus curiae* may be taxed to the parties, as appropriate, in the Court's discretion. *See* 3B C.J.S. Amicus Curiae § 6 ("Where the court appoints an amicus curiae who renders services which prove beneficial to the solution of the question presented, the court may properly award compensation and direct it to be paid by the party responsible for the situation that

Finally, some have expressed concern that enhanced judicial scrutiny of disclosure settlements could lead plaintiffs to sue fiduciaries of Delaware corporations in other jurisdictions in the hope of finding a forum more hospitable to signing off on settlements of no genuine value. It is within the power of a Delaware corporation to enact a forum selection bylaw to address this concern.[48] In any event, it is the Court's opinion, based on its extensive experience in adjudicating cases of this nature, that the historical predisposition that has been shown towards approving disclosure settlements must evolve for the reasons explained above. We hope and trust that our sister courts will reach the same conclusion if confronted with the issue.

With the foregoing considerations in mind, I consider next the "give" and the "get" of the proposed settlement in this case.

### C. The Supplemental Disclosures Are not Material and Provided no Meaningful Benefit to Stockholders

Under Delaware law, when directors solicit stockholder action, they must "disclose fully and fairly all material information within the board's control."[49] Delaware has

---

prompted the court to make the appointment."). *Cf. Chapin v. Benwood Found., Inc.*, 1977 WL 2583, at *1 (Del. Ch. June 28, 1977) (describing appointment of individual trustee defendant as *amicus curiae* with costs paid by defendant corporation, as agreed by the parties). Scholars have proposed a similar solution in which the Court may "appoint an objector as a kind of guardian ad litem for the class." *See* Griffith & Lahav, *supra* note 23, at 1122 n.309 (compiling sources for proposal).

[48] *See Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 963 (Del. Ch. 2013) (upholding statutory validity of forum selection bylaw).

[49] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

adopted the standard of materiality used under the federal securities laws. Information is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[50] In other words, information is material if, from the perspective of a reasonable stockholder, there is a substantial likelihood that it "significantly alter[s] the 'total mix' of information made available."[51]

Here, the joint Proxy that Trulia and Zillow stockholders received in advance of their respective stockholders' meetings to consider whether to approve the proposed transaction ran 224 pages in length, excluding annexes. It contained extensive discussion concerning, among other things, the background of the mergers, each board's reasons for recommending approval of the proposed transaction, prospective financial information concerning the companies that had been reviewed by their respective boards and financial advisors, and explanations of the opinions of each company's financial advisor. In the case of Trulia, the opinion of J.P. Morgan was summarized in ten single-spaced pages.

The Supplemental Disclosures plaintiffs obtained in this case solely concern the section of the Proxy summarizing J.P. Morgan's financial analysis, which the Trulia board cited as one of the factors it considered in deciding to recommend approval of the proposed merger.[52] Specifically, these disclosures provided additional details concerning:

---

[50] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (adopting materiality standard of *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[51] *Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270 at 1277.

[52] Proxy at 118.

(1) certain synergy numbers in J.P. Morgan's value creation analysis; (2) selected comparable transaction multiples; (3) selected public trading multiples; and (4) implied terminal EBITDA multiples for a relative discounted cash flow analysis.

Relevant to considering the materiality of information disclosed in this section of the Proxy, then-Vice Chancellor Strine observed in *In re Pure Resources, Inc. Shareholders Litigation* that there were "conflicting impulses" in Delaware case law about whether, when seeking stockholder action, directors must disclose "investment banker analyses in circumstances in which the bankers' views about value have been cited as justifying the recommendation of the board."[53] The Court held that, under Delaware law, when the board relies on the advice of a financial advisor in making a decision that requires stockholder action, those stockholders are entitled to receive in the proxy statement "a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely."[54] This "fair summary" standard has been a guiding principle for this Court in considering proxy disclosures concerning the work of financial advisors for more than a decade.[55]

---

[53] 808 A.2d 421, 449 (Del. Ch. 2002) (discussing, among other decisions, *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170 (Del. 2000) and *McMullin v. Beran*, 765 A.2d 910 (Del. 2000)).

[54] *Id.*

[55] *See, e.g.*, *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 203-04 (Del. Ch. 2007) ("[W]hen a banker's endorsement of the fairness of a transaction is touted to

A fair summary, however, is a *summary*. By definition, it need not contain all information underlying the financial advisor's opinion or contained in its report to the board.[56] Indeed, this Court has held that the summary does not need to provide sufficient data to allow the stockholders to perform their own independent valuation.[57] The essence

shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.").

[56] *See, e.g., In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785, at *11 (Del. Ch. Feb. 29, 2012) (rejecting claim that the board failed to disclose underlying assumptions and bases for probabilities of success of clinical trial drugs) ("Stockholders are entitled to a fair summary of the substantive work performed by the investment bankers, but Delaware courts have repeatedly held that a board need not disclose specific details of the analysis underlying a financial advisor's opinion.") (internal quotation marks omitted); *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 511 (Del. Ch. 2010) (holding stockholders are entitled to fair summary, but not to minutiae, and rejecting requests for additional disclosures); *Ryan v. Lyondell Chem. Co.*, 2008 WL 2923427, at *20 & n.120 (Del. Ch. July 29, 2008) (finding that fair summary did not require disclosure of all projections, as long as it disclosed description of valuation exercises, key assumptions, and range of values generated; but noting that the failure to disclose that the financial advisor used a significantly higher WACC in its calculation than management's WACC estimate, even when it was using management's other financial projections, could constitute a disclosure violation), *rev'd on other grounds*, 970 A.2d 235 (Del. 2009). *See also David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *9-10 (Del. Ch. June 27, 2008) (distinguishing *Pure Resources* as a case in which a proxy statement was deficient because it did not disclose "*any* substantive portions of the bankers' work") (internal quotation marks omitted); *In re MONY Grp. Inc. S'holder Litig.*, 852 A.2d 9, 28 (Del. Ch. 2004) ("The plain meaning of 'summary' belies the Stockholders' interpretation.").

[57] *See Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *12-13 (Del. Ch. Nov. 30, 2007) (rejecting disclosure claims for various details that may have been helpful in determining accuracy of analysis) ("Delaware law does not require disclosure of all the data underlying a fairness opinion such that a shareholder can make an independent determination of value."); *In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *16 (Del. Ch. May 4, 2005) (rejecting claim for information that would amount to "the raw data behind the advisors' updated summaries") ("A disclosure that does not include all financial data needed to make an independent determination of fair value is not, however, per se misleading or omitting a material fact. The fact that the

28

of a fair summary is not a cornucopia of financial data, but rather an accurate description of the advisor's methodology and key assumptions.[58] In my view, disclosures that provide extraneous details do not contribute to a fair summary and do not add value for stockholders.[59]

With the foregoing principles in mind, I consider next whether any of the four specific Supplemental Disclosures that plaintiffs obtained here were material or whether they provided any benefit to Trulia's stockholders at all.

---

financial advisors may have considered certain non-disclosed information does not alter this analysis."), *aff'd*, 897 A.2d 162 (Del. 2006).

One important qualification bears mention. Although management projections and internal forecasts are not *per se* necessary for a fair summary, this Court has placed special importance on this information because it may contain unique insights into the value of the company that cannot be obtained elsewhere. *See In re Netsmart Techs.*, 924 A.2d at 203 (noting that management projections can be important because management can have "meaningful insight into their firms' futures that the market [does] not").

[58] *See In re 3Com S'holders Litig.*, 2009 WL 5173804, at *2-3 (Del. Ch. Dec. 18, 2009) (rejecting claim for omission of financial projections because "an adequate and fair summary of the work performed by [the advisor] [was] included in the proxy"); *In re CheckFree Corp. S'holders Litig.*, 2007 WL 3262188, at *3 (Del. Ch. Nov. 1, 2007) (distinguishing *Netsmart* and rejecting disclosure claim based on omission of management financial projections, because proxy statement fairly summarized financial advisor's methods and conclusions); *In re Pure Res.*, 808 A.2d at 449 (noting in fair summary discussion that stockholders would find it material to know the advisor's basic valuation exercises, key assumptions of those exercises, and range of values produced).

[59] *See In re PAETEC Hldg. Corp. S'holders Litig.*, 2013 WL 1110811, at *8 (Del. Ch. Mar. 19, 2013) (citing *In re Pure Res.*, 808 A.2d at 449) (declining to award settlement fees for disclosures that "provide a level of detail beyond what the law of Delaware requires").

29

### 1. Synergy Numbers in the Value Creation Analysis

The Supplemental Disclosures provided some additional details in the sections of J.P. Morgan's analysis entitled "Value Creation Analysis – Intrinsic Value Approach" and "Value Creation Analysis – Market-Based Approach." In the "Intrinsic Value Approach" analysis, J.P. Morgan compared the implied equity value derived from its discounted cash flow analysis of Trulia on a standalone basis to Trulia stockholders' pro forma ownership of the implied equity value of the combined company. In the "Market- Based Approach," J.P. Morgan compared the public market equity value of Trulia on a standalone basis to Trulia stockholders' pro forma ownership of the implied equity value of the combined company.

As supplemented, the disclosure concerning the Intrinsic Value Approach reads in relevant part as follows, with the information that was added to the original disclosure in the Proxy appearing in bolded text:

> The pro forma combined company equity value was equal to: (1) the Trulia standalone discounted cash flow value of $2.9 billion, plus (2) the Zillow standalone discounted cash flow value of $6.2 billion, plus (3) $2.2 billion, **representing** the present value of **(a)** Trulia's management expected after-tax synergies **of $2.4 billion**, less **(b)** Trulia's management estimates of **(i)** the one-time costs to achieve such synergies **of $65.0 million** and **(ii)** transaction expenses of $**85 million. The present value of after-tax synergies was based on an estimate of $175.0 million in synergies to be fully realized starting in 2016, extrapolated through 2029 based on assumptions provided by Trulia's management**.[60]

---

[60] Supplemental Disclosures at 5-6.

Plaintiffs argue that the disclosure of the $175 million synergies figure in the quote above was important because it is substantially different from the $100 million in synergies that J.P. Morgan used in the Market-Based Approach, which figure already was disclosed in the Proxy.[61] According to plaintiffs, "[h]ad [stockholders] initially known that the market-based approach analysis was skewed downward by using lower synergies numbers, their view as to the resulting implied value and reliability of [J.P. Morgan's] analysis may have changed appreciably."[62] There are three fundamental problems with this argument.

First, although plaintiffs question why J.P. Morgan used two different synergies figures in two different analyses, they provide no explanation as to why doing so would be inappropriate. To the contrary, it seems logical that an intrinsic value approach (which is based on a comparison derived from a discounted cash flow analysis) would use synergies based on long-term management projections, while a market-based approach (which is based on a comparison to the public market equity value of Trulia) would use synergies based on what would be publicly announced to investors. Regardless, the Proxy accurately disclosed which synergies assumptions the financial advisor deemed appropriate to use in each analysis.[63]

---

[61] Pls.' Br. Supp. Proposed Settlement at 23 (citing Proxy at 103 (noting that the synergies "are expected to be at least $100 million in annualized cost savings by 2016")).

[62] *Id.* at 23-24.

[63] Proxy at 130, 132.

Second, the $175 million synergies figure that plaintiffs consider so important was not new information. It already was disclosed in the Proxy, which contained the following table providing information about management's synergies expectations:[64]

> The following table presents summary estimated synergies that Trulia's management also prepared in respect of the combined company following the completion of the mergers for the calendar years ending 2014 through 2024 in connection with Trulia's evaluation of the mergers.

| | Trulia Management Estimated Synergies | | | | | | | | | | |
| | (in millions, unaudited) | | | | | | | | | | |
| | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E |
| Total Operating Synergies (1) | $— | $23 | $175 | $225 | $285 | $349 | $416 | $480 | $535 | $574 | $594 |

> (1) *"Total Operating Synergies" means the expected EBIT effect of revenue synergies plus the EBIT effect of cost savings/cost avoidance less one-time costs to achieve and retain such synergies. "EBIT" means earnings before interest and taxes. An assumed tax rate of 40% was applied to Total Operating Synergies to determine estimated after-tax synergies. Projected synergies (including costs to achieve synergies) were prepared by Trulia's management through fiscal year 2016 after discussion with Zillow's management. The management of Trulia provided J.P. Morgan with assumptions relating to projected synergies for fiscal years 2017 through 2024 deemed appropriate by Trulia's management. The management of Trulia then directed J.P. Morgan to use these assumptions in extrapolating such estimated synergies for fiscal years extending beyond those for which the management of Trulia had provided projections. The management of Trulia then reviewed and approved such extrapolation of the synergies.[65]*

Because the $175 million figure for 2016 synergies already appeared in this table, inserting it into a methodological paragraph a few pages later is of no benefit to

---

[64] Plaintiffs' counsel was not aware that this information already was disclosed in the Proxy until the Court pointed it out at the settlement hearing. *See* Hr'g Tr. 12-15, Sept. 16, 2015. If the proposed settlement had been opposed, this fact presumably would have been brought to the attention of plaintiffs and the Court.

[65] Proxy at 123.

stockholders. In my view, the supplemental disclosure may have added confusion more than anything else, because it lacks explanatory context and does not clearly describe the nature of management's estimate of synergies that was disclosed in the original Proxy.[66]

Third, plaintiffs exaggerate the significance of juxtaposing the synergy figures used in the Intrinsic Value Approach with those used in the Market-Based Approach. In contrast to the Intrinsic Value Approach, the Market-Based Approach was placed in the end of the summary of the financial advisor's analysis in the "Other Information" section, was termed an "illustrative value creation analysis," and "was presented merely for informational purposes."[67] As plaintiffs concede, a "fair reading" of the Proxy indicates that the Market-Based Approach analysis was less important than the Intrinsic Value Approach analysis.[68] Thus, the notion that the disclosure of the $175 million synergies figure used in one analysis (which already was disclosed in the Proxy) was significant because it was higher than the $100 million figure used in a second, different analysis is based on a false equivalence of the relative importance of the two analyses.

In sum, the disclosures in the original Proxy already provided a fair summary of J.P. Morgan's methodology and assumptions in its two "Value Creation" analyses.

---

[66] For instance, the Supplemental Disclosures refer to the expected synergies after 2016 as extrapolations through 2029 based on management's assumptions. But the table in the Proxy, produced above, notes that management provided assumptions regarding synergies through 2024. Plaintiffs do not address this ambiguity.

[67] Proxy at 131-32.

[68] Hr'g Tr. 15, Sept. 16, 2015.

Inserting additional minutiae underlying some of the assumptions could not reasonably have been expected to significantly alter the total mix of information and thus was not material. Indeed, in my view, the supplemental information was not even helpful to stockholders.

### 2. Individual Company Multiples in the Selected Transaction Analysis

The Proxy disclosed that J.P. Morgan used publicly available information to analyze certain selected precedent transactions involving companies engaged in businesses that J.P. Morgan considered analogous to Trulia's businesses.[69] The Proxy listed the date, the target, and the acquirer for each of 32 transactions that were considered. It also disclosed the low and high forward EBITDA multiples for the group of transactions. Using a narrower range of multiples falling between the low and the high for the group, J.P. Morgan created an estimated range of equity values per share for Trulia common stock. This methodology was summarized in the Proxy as follows:

> J.P. Morgan reviewed the implied firm value for each of the transactions as a multiple of the target company's two-year forward EBITDA immediately preceding the announcement of the transaction. The analysis indicated a range of EBITDA multiples of 8.0x to 69.1x. Based on the result of this analysis and other factors that J.P. Morgan considered appropriate, J.P. Morgan applied an EBITDA multiple range of 10.0x to 23.0x to Trulia's fiscal 2015 Adjusted EBITDA and arrived at an estimated range of equity values per share for Trulia common stock of $17.25-$38.50.[70]

---

[69] Proxy at 129-30.

[70] *Id.* at 130.

Plaintiffs' grievance is that the Proxy did not provide the relevant multiples for each of the 32 individual transactions. The individual multiples were added in the Supplemental Disclosures for those transactions for which the information was publicly available.[71] The addition of this information made evident that multiples were not publicly available for 15 of the 32 transactions. Plaintiffs argue that, without the Supplemental Disclosures, stockholders would not have realized that J.P. Morgan's analysis did not consider multiples for half of the precedent transactions it listed and was therefore less robust than the Proxy portrayed it to be.

The addition of the individual multiples and the revelation that some were not publicly available could not reasonably have been expected to significantly alter the total mix of information. No argument is made, for example, that having 16 similar transactions was not sufficient to perform the analysis that J.P. Morgan conducted. The discussion in the Proxy, moreover, including the portion quoted above, fairly summarized the methodology and assumptions J.P. Morgan used in conducting that analysis to extrapolate a range of per share values for Trulia stock. A fair summary does not require disclosure of sufficient data to allow stockholders to perform their own valuation.[72]

---

[71] In one case, the publicly available multiple was not included because it exceeded 100x and thus was not considered meaningful. Supplemental Disclosures at 5.

[72] *In re Gen. Motors (Hughes)*, 2005 WL 1089021, at *16.

This conclusion is supported by the Court's decision in *In re MONY Group Shareholder Litigation.*[73] There, the Court rejected a similar argument that the disclosure of transaction multiples was important because it showed that 25% of the multiples in a set of 71 transactions were unavailable. After noting that the plaintiffs had not argued that the financial advisor did not have sufficient data to perform its analysis, the Court held that the additional information was "immaterial, as a matter of law," and a "triviality [that] could not reasonably be expected to affect the total mix of information."[74] In my view, the addition of similar trivialities was not helpful to Trulia's stockholders here.

### 3. Individual Company Multiples in the Selected Public Trading Analysis

The Proxy disclosed the names of sixteen publicly traded companies that J.P. Morgan used to construct ranges of forward EBITDA and revenue multiples for Trulia and Zillow.[75] The Proxy provided these multiples for Trulia and Zillow based on their last unaffected trading day before the announcement of the merger, and provided the median multiples for the three groups into which J.P. Morgan categorized the sixteen comparable companies: "Real Estate," "Software as a Service," and "Other." The Proxy did not include individual multiples for the peer companies.

---

[73] 852 A.2d 9 (Del. Ch. 2004).

[74] *Id.* at 28.

[75] Proxy at 125-26.

The Supplemental Disclosures added the revenue and EBITDA multiples for each of the sixteen companies. Citing *In re Celera Corporation Shareholder Litigation*,[76] plaintiffs argue, in essence, that individual company multiples are material *per se*. That is not a fair reading of the case. In *Celera*, the Court commented that "as a matter of best practices, a fair summary of a comparable companies or transactions analysis probably should disclose the market multiples derived for the comparable companies or transactions."[77] Although the decision reluctantly concluded that a multiples disclosure was compensable, it found it "questionable whether [the multiples] altered the 'total mix' of available information" because that information "already was publicly available."[78] The individual company multiples in the Supplemental Disclosures here also were already publicly available.[79]

---

[76] 2012 WL 1020471 (Del. Ch. Mar. 23, 2012), *aff'd in part, rev'd in part on other grounds*, 59 A.3d 418 (Del. 2012).

[77] *Id.* at *32.

[78] *Id.*

[79] Meinhart, plaintiffs' expert, points out that not all stockholders can access all of this information because some of the forward-looking data are available only from proprietary fee-based services. It may be correct that not all of these data would be freely or easily obtainable. A fair summary, however, does not require disclosure of sufficient data to allow stockholders to perform their own valuation. And it certainly does not require disclosure of underlying data that stockholders could obtain on their own, even if doing so would involve some cost or investment of time. Meinhart also opines that the multiples show a high level of dispersion, but he fails to explain how that information undermines J.P. Morgan's analysis or is otherwise informative considering that J.P. Morgan explicitly stated that its analysis was not strictly quantitative in nature. *See* Proxy at 126-27 ("J.P. Morgan did not rely solely on the quantitative results . . . . Based on various judgments concerning relative comparability of each of the selected companies to

37

More importantly, the original disclosures in *Celera* simply listed the comparable companies with no summary multiple data at all.[80] Although the supplemental disclosures in that case added *summary* data for each of three categories of companies, they did not provide any individual company multiples.[81]  In other words, the disclosures in Trulia's Proxy, which provided the median multiples for three different categories of companies that J.P. Morgan considered in its judgment to be similar to Trulia, essentially started at the point where *Celera* ended.[82]

Plaintiffs next argue that the individual multiples are important here because they allow stockholders to compare the selected companies' EBITDA growth rates and EBITDA multiples to Trulia's.  This argument is unpersuasive for two reasons.  First, basic valuation principles already would suggest to stockholders that higher growth rates

---

Trulia, as well its experience with the industry . . . J.P. Morgan selected a range of revenue and Adjusted EBITDA multiples that it believed reflected an appropriate range of multiples applicable to Trulia.").

[80] *See In re Celera Corp.*, 2012 WL 1020471, at *32.

[81] *See id.*  The supplemental disclosure in *Celera* added more categories of summary data, namely the high, low, median, and mean multiples.  This distinction is immaterial.  The point of a fair summary is to summarize the methodologies and assumptions the financial advisor used in its analysis.  Here, the Proxy fairly summarizes J.P. Morgan's use of multiples in its trading multiples analysis.

[82] Plaintiffs also rely on a transcript ruling in *Turberg v. ArcSight*, C.A. No. 5821-VCL (Del. Ch. Sept. 20, 2011) (TRANSCRIPT).  As in *Celera*, the initial description in *ArcSight* did not have any multiples at all.  The plaintiff obtained a full description of the analysis comparable to the depiction that would appear in a board book.  The Court praised that disclosure in the context of a non-adversarial presentation regarding settlement approval.  The case is distinguishable because, unlike here, no summary multiples were initially provided to stockholders.

should correspond to higher multiples.[83] Second, the Supplemental Disclosures do not contain EBITDA growth rates, so the figures necessary to make that comparison are not present in any event. Thus, plaintiffs have not persuaded me that individual company multiples are material or were even helpful in this case.

### 4. Implied Terminal EBITDA Multiples in the DCF Analysis

J.P. Morgan performed a relative discounted cash flow analysis to determine the per-share equity values of Trulia and Zillow, using expected cash flows from 2014 through 2028 based on management's projections for each company and the perpetuity growth method to calculate the companies' respective terminal values.[84] The Proxy explained this methodology and provided the assumptions J.P. Morgan used in its analysis. Specifically, the Proxy disclosed management's projections of unlevered free cash flows, the ranges of discount rates (11.0% to 15.0%) and perpetuity growth rates (2.5% to 3.5%) that were used, the terminal period projected cash flows, and other details.[85] In my view, these disclosures already provided a more-than-fair summary of the relative discounted cash flow analysis that J.P. Morgan performed.

---

[83] Joshua Rosenbaum & Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions* 19 (2009) ("A company's growth profile, as determined by its historical and estimated future financial performance, is an important driver of valuation. Equity investors reward high growth companies with higher trading multiples than slower growing peers.").

[84] *See* Proxy at 127.

[85] *See id.* at 108, 122, 127.

39

The Supplemental Disclosures added to this summary the EBITDA exit multiple ranges for Trulia and Zillow that were implied by the range of terminal values calculated based on J.P. Morgan's chosen inputs. Plaintiffs argue that, although J.P. Morgan used the perpetuity growth method and only derived the implied EBITDA exit multiples to check the strength of its methodology, the implied multiples were important to stockholders, who would be concerned that the exit multiples for Trulia and Zillow are nearly identical despite differences in their current EBITDA growth rates, and that the exit multiples are much lower than the current EBITDA multiples of Trulia and its peers.[86]

The logic of plaintiffs' argument is flawed in two respects. First, because the same range of perpetuity growth rates (2.5% to 3.5%) was used to calculate the terminal values for both companies, it should not have been surprising that the implied exit EBITDA multiples would be similar for both companies: 4.0x to 6.7x for Trulia and 4.1x to 6.8x for Zillow. Second, although Trulia's then-current EBITDA growth rate was high, the exit EBITDA multiples are based on growth assumptions *as of 2028*, *not 2015*, and the 2015 growth rate cannot realistically continue through the projection period.[87] Basic principles of valuation suggest that it would be more reasonable to forecast that the

---

[86] Pls.' Br. Supp. Proposed Settlement at 30-31.

[87] *Id.* at 26 (noting Trulia's expected EBITDA growth rate of 148% and the "decided correlation between higher growth rates and higher valuation multiples"). Were Trulia able to retain this impressive EBITDA growth rate for the entire forecast period, its 2028 EBITDA would amount to nearly $10 trillion, more than half the current GDP of the United States.

growth of both Trulia and Zillow eventually would fall to a market-based rate, making plaintiffs' comparison to the current growth rates of Trulia and its peers inappropriate.[88] Thus, not only is the supplemental disclosure immaterial, it also serves none of the purposes that plaintiffs allege.

\* \* \* \* \*

For the reasons explained above, none of plaintiffs' Supplemental Disclosures were material or even helpful to Trulia's stockholders. The Proxy already provided a more-than-fair summary of J.P. Morgan's financial analysis in each of the four respects criticized by the plaintiffs. As such, from the perspective of Trulia's stockholders, the "get" in the form of the Supplemental Disclosures does not provide adequate consideration to warrant the "give" of providing a release of claims to defendants and their affiliates, in the form submitted[89] or otherwise. Accordingly, I find that the proposed settlement is not fair or reasonable to Trulia's stockholders.[90]

---

[88] *See* Rosenbaum & Pearl, *supra* note 83, at 132 ("The perpetuity growth rate is typically chosen on the basis of the company's expected long-term industry growth rate, which generally tends to be within a range of 2% to 4% (i.e., nominal GDP growth).").

[89] As noted above, after the settlement hearing, the parties commendably agreed to narrow the release to exclude "Unknown Claims," foreign claims, and claims arising under state or federal antitrust law. Nevertheless, even if the Supplemental Disclosures had provided sufficient consideration to warrant the "give" of a release of claims, which they did not, the scope of the revised release still would have been too broad to support a fair and reasonable settlement because the revised release was not limited to disclosure claims and fiduciary duty claims concerning the decision to enter the merger.

[90] Because I reject the proposed settlement, I do not address the issue of class certification, although stockholder classes in cases such as this are typically certified.

## III. CONCLUSION

For the foregoing reasons, approval of the proposed settlement is DENIED.

**IT IS SO ORDERED.**