# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| AN NGUYEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 11511-VCG |
| | ) |
| MICHAEL G. BARRETT, THOMAS R. | ) |
| EVANS, ROBERT P. GOODMAN, | ) |
| PATRICK KERINS, ROSS B. | ) |
| LEVINSOHN, WENDA HARRIS | ) |
| MILLARD, JAMES A. THOLEN, AOL | ) |
| INC., and MARS ACQUISITION SUB, | ) |
| INC., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Date Submitted: June 30, 2016
Date Decided: September 28, 2016

James R. Banko and Derrick B. Farrell, of FARUQI & FARUQI, LLP, Wilmington, Delaware; OF COUNSEL: Juan E. Monteverde, of MONTEVERDE & ASSOCIATES PC, New York, New York; Michael J. Palestina, of KAHN SWICK & FOTI, LLC, Madisonville, Louisiana, *Attorneys for Plaintiff*.

Kevin R. Shannon and Jaclyn C. Levy, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: William Savitt, Anitha Reddy, and Nicholas Walter, of WACHTELL, LIPTON, ROSEN & KATZ, New York, New York, *Attorneys for All Defendants*.

GLASSCOCK, Vice Chancellor

This matter can now be considered twice-tested, but not in the beneficial sense made famous by Professor Berle. The action involves a challenge to a merger agreement, brought pre-close, alleging inadequate price and process, as well as some thirty disclosure violations. In his motion for preliminary injunctive relief,[1] however, the Plaintiff pursued only his "serious"[2] disclosure violation, involving lack of disclosure of purportedly material financial information. I found that a preliminary injunction was unsustainable on the merits, and the Plaintiff sought an interlocutory appeal, which our Supreme Court denied. The stockholders overwhelmingly chose to tender into the merger, which closed; the Plaintiff now seeks damages for breach of duty in regard to two alleged mal-disclosures; one, the financial disclosure claim I found not reasonably likely to succeed at the preliminary injunction stage; and a second, involving incentives of the financial advisor, which the Plaintiff pled pre-close but elected not to argue in the motion for preliminary injunctive relief—presumably, his second most serious disclosure claim. For the reasons below, I find that neither claim can withstand a motion to dismiss.

---

[1] The pleadings and briefing in this case have referred to the Plaintiff, An Nguyen, by both male and female pronouns. Here I use the pronoun used by Plaintiff's counsel in their most recent filing. No disrespect is meant if this is incorrect.

[2] Prelim. Inj. Hrg. Tr. 11:15–19.

1

## I. BACKGROUND

The matter is currently before me on Defendants' Motion to Dismiss the Second Verified Amended Complaint (the "Motion").[3] On September 16, 2015, Plaintiff An Nguyen on behalf of himself, and a class of similarly situated stockholders of Millennial Media, Inc. ("Millennial" or the "Company"), filed this action, challenging the proposed acquisition of the Company by AOL, Inc. ("AOL") for $1.75 per share in cash through a tender offer and second-step short-form merger, pursuant to 8 *Del. C.* § 251(h) (the "Transaction").[4] In his initial complaint, the Plaintiff brought two counts: one for breach of the fiduciary duties of loyalty and care against the directors of Millennial (the "Director Defendants"), for their alleged failure to obtain a fair price or follow a fair process with respect to the Transaction; and the other against AOL for aiding and abetting those breaches. Because the Plaintiff has since abandoned those claims, as discussed *infra*, I need not detail the rigorous sales process conducted by the Millennial board, which culminated in the Transaction.

---

[3] The facts are drawn from the well-pled allegations of Plaintiff's Second Amended Complaint (the "Complaint") and documents integral to the Complaint or incorporated by reference therein, and are presumed true for purposes of evaluating Defendants' Motion.

[4] This price represented, at the time, a 33% premium for Millennial's shares. Defs' Opening Br., Transmittal Aff. of Jaclyn C. Levy, Esq., Ex. A (the "Proxy"), at 23. This action is one of five lawsuits filed challenging the Transaction between September 10 and September 16, 2015. The other four suits, which were all voluntarily dismissed, were *Parshall v. Millennial Media, Inc.*, C.A. No. 11485-VCG (Sept. 9, 2015); *Desjardins v. Millennial Media, Inc.*, C.A. No. 11490-VCG (Sept. 10, 2015); *Chen v. Barrett*, C.A. No. 11496-VCG (Sept. 10, 2015); and *Wagner v. Barrett*, C.A. No. 11503-VCG (Sept. 15, 2015). Defs' Opening Br. 8–9.

The Millennial board unanimously approved the merger agreement on September 2, 2015.[5] It was executed, and the Transaction announced, the following day.[6] AOL commenced the tender offer on September 18, 2015.[7] That same day, the Company filed a Schedule 14D-9 Solicitation/Recommendation Statement (the "Proxy") with the SEC, in connection with the tender offer.[8] On September 24, 2015, the Plaintiff filed his first amended complaint, adding roughly thirty alleged disclosure violations concerning financial analyses prepared by the Company's financial advisor, LUMA Securities LLC ("LUMA"); Millennial's projections; board conversations with other potential bidders; and the Director Defendants' stock ownership.[9]

The Plaintiff moved for expedited proceedings and for preliminary injunctive relief on September 29, 2015. Following a telephone conference held on October 6, 2015, I determined that expedited discovery was not warranted and directed the parties to complete truncated briefing on the preliminary injunctive relief request; specifically, I directed the Plaintiff to clarify his grounds for relief sought, which to that point had constituted somewhat of a moving target. I heard oral argument on October 8, 2015, immediately following which I denied Plaintiff's request for

---

[5] Proxy, at 12.
[6] Compl. ¶ 5.
[7] *Id.* at ¶ 3.
[8] *Id.* at ¶ 88.
[9] First Am. Compl. ¶¶ 88–97.

preliminary injunctive relief. The Plaintiff then moved for certification of an emergency interlocutory appeal to the Delaware Supreme Court. After taking the matter under review, I issued a letter opinion later that day denying Plaintiff's request.[10] The Supreme Court refused the appeal on October 9, 2015.[11]

In seeking preliminary injunctive relief, the Plaintiff pursued only one of the roughly thirty disclosure violations alleged in his first amended complaint: a claim concerning unlevered, after-tax free cash flow projections ("UFCF"). The Plaintiff advanced two principal—and mutually exclusive—arguments concerning this claim. First, although the Plaintiff acknowledged that our case law indicates that banker-derived financial projections need not be disclosed, he argued that here, Millennial management forecasted all of the components of the UFCF and the Company's financial advisor, LUMA, simply plugged those values into a widely used formula. As a result, the Plaintiff argued, either those inputs or the UFCF themselves should be disclosed. Second, and in the alternative, the Plaintiff contended that a corrective disclosure was required because the Proxy misleadingly created the impression that Millennial management, and not LUMA, calculated the UFCF that were used by LUMA to perform its discounted-cash-flow analysis.

---

[10] *Nguyen v. Barrett*, 2015 WL 5882709 (Del. Ch. Oct. 8, 2015).
[11] *Nguyen v. Barrett*, 2015 WL 5924668, *1 (Del. Oct. 9, 2015) (TABLE).

4

After careful review of the Proxy and applicable precedent, I determined that "a fair reading of the Proxy disclosed accurately that management did not prepare forecasts of unlevered, after-tax free cash flows,"[12] and, "[w]ith respect to the argument that all inputs provided by management on which the financial advisor relied in its [discounted cash flow] valuation must, as a matter of law, be disclosed to stockholders, I found such a *per se* rule inconsistent with our case law."[13] In sum, I concluded that "the Plaintiff had failed to demonstrate under the facts here that the Proxy was materially incomplete or misleading."[14]

The tender offer was completed on October 22, 2015, and the merger closed the following day.[15] Just over 80% of shares were tendered into the offer.[16] The Plaintiff filed a second amended complaint (the "Complaint") on January 4, 2016, which repeats the price and process claims (including aiding and abetting against AOL) of the earlier complaints, narrows down the alleged disclosure violations to only three claims, and adds a count for "quasi-appraisal."[17]

---

[12] *Nguyen*, 2015 WL 5882709, at *3.

[13] *Id.* at *4.

[14] *Id.*

[15] Compl. ¶ 5.

[16] *Id.*

[17] I note, however, that quasi-appraisal is a *remedy*, not a cause of action. *See Houseman v. Sagerman*, 2015 WL 7307323, at *4 (Del. Ch. Nov. 19, 2015) ("[Q]uasi-appraisal is not itself a cause of action, but is instead a remedy that, where appropriate, awards stockholders damages based on the going-concern value of their previously owned stock upon a finding of a breach of fiduciary duty, such as the duty to disclose.") (citation omitted). The Complaint may not be sustained solely on the basis of a count for quasi-appraisal; rather, the Plaintiff must demonstrate some underlying violation, for which quasi-appraisal is the appropriate remedy. *See, e.g.*, *Chen v. Howard-Anderson*, 87 A.3d 648, 691 (Del. Ch. 2014) ("If the plaintiffs prove at trial that the

The Defendants filed their Motion to Dismiss on January 19, 2016, and the parties completed briefing. Through his briefing, the Plaintiff implicitly waived the price and process claims, by failing to defend them with any argument or authority,[18] and expressly waived one of his three remaining disclosure claims.[19] I heard oral argument on June 30, 2016, following which the Plaintiff voluntarily waived his aiding and abetting claim against AOL.[20] That leaves for my consideration here only two disclosure claims: the first, concerning the Company's UFCF which was the subject of the preliminary injunctive relief hearing; and a second, concerning LUMA's contingent-fee arrangement. For the following reasons, I find that the Plaintiff has failed to state a non-exculpated claim of breach of fiduciary duty with respect to either alleged disclosure violation; accordingly, I grant Defendants' Motion.

---

defendants committed a non-exculpated breach of the fiduciary duty of disclosure, then damages can be awarded using a quasi-appraisal measure.").

[18] *See Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, 2007 WL 2982247, at \*11 (Del. Ch. Oct. 9, 2007) ("The plaintiffs have waived these claims by failing to brief them in their opposition to the motion to dismiss.") (citing *Emerald Partners v. Berlin*, 2003 WL 21003437, at \*43 (Del. Ch. Apr. 28, 2003) (stating "[i]t is settled Delaware law that a party waives an argument by not including it in its brief")).

[19] *See* Pl's Answering Br. 13 n.7 ("However, in light of recent developments in Delaware disclosure law, *see, e.g.*, *In re Trulia, Inc. Stockholder Litigation*, 129 A.2d 884, 901 n.57 (Del. Ch. 2016), Plaintiff has elected not to raise [the third] disclosure point in this opposition.").

[20] Transcript of June 30, 2016 Oral Arg. 77:15–17.

6

## II. ANALYSIS

The Defendants move to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim. When considering such a motion, the Court must accept all well-pled factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and deny the motion "unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[21]

In order to sustain a *pre-close* disclosure claim, heard on a motion for preliminary injunctive relief, a plaintiff must demonstrate "a reasonable likelihood of proving that the alleged omission or misrepresentation is material;"[22] by contrast, when asserting a disclosure claim for damages against directors *post-close*, a plaintiff must allege facts making it reasonably conceivable that there has been *a non-exculpated breach* of fiduciary duty by the board in failing to make a material disclosure.[23] "Information is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote"; or, in other words, "if, from the perspective of a reasonable stockholder, there is a substantial likelihood that it significantly alters the 'total mix' of information made

---

[21] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536–37 (Del. 2011).

[22] *In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 896 (Del. Ch. 2016) (internal quotation omitted).

[23] *Chen v. Howard*, 87 A.3d 648, 691 (Del. Ch. 2014) ("If the plaintiffs prove at trial that the defendants committed a non-exculpated breach of the fiduciary duty of disclosure, then damages can be awarded using a quasi-appraisal measure.").

available."[24]  Where, as here, an exculpation provision under 8 *Del. C.* § 102(b)(7) shields a board from duty-of-care claims, this means a plaintiff must demonstrate that a majority of the board was not disinterested or independent, or that the board was otherwise disloyal because it failed to act in good faith, in failing to make the material disclosure.[25]  A showing of bad faith requires an "extreme set of facts to establish that disinterested directors were intentionally disregarding their duties or that the decision . . . [was] so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[26]  For the following reasons, the Plaintiff has failed to clear the bar of pleading disloyalty with regard to either disclosure claim.

---

[24] *Trulia*, 129 A.3d at 899 (internal quotations omitted).

[25] *In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at \*6 (Del. Ch. Jan. 31, 2013).  To the extent it was not waived at oral argument, I reject Plaintiff's contention, expressed in briefing, that because the existence of a 102(b)(7) exculpatory provision was not explicitly pled in Plaintiff's Complaint, it is outside the bounds of Defendants' Motion to Dismiss.  Plaintiff's position, if accepted, would undermine the very purpose of a 102(b)(7) exculpation provision— that is, to spare directors from the burden and expense of litigation where the only conceivable claim is one for breach of the duty of care.  Nor does Plaintiff's position comport with the Delaware Supreme Court's decision in *In re Cornerstone Therapeutics Inc, Stockholder Litigation*, 115 A.3d 1173 (Del. 2015), where the Court held that, even in the entire fairness context, a case may be dismissed at the motion-to-dismiss stage if the plaintiff has not alleged any non-exculpated claims against the director defendants.  *Id.* at 1187.  Rather, as the Delaware Supreme Court indicated in *Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001), the Court can take judicial notice of the existence of a 102(b)(7) exculpatory provision, which can easily be found in public filings on record with the Delaware Secretary of State's office.  *See id.* at 1090 ("The trial court therefore tacitly accepted it as authentic without defendants formally asking the court to take judicial notice of [102(b)(7) provision's] existence, which could easily be found in the public files in the Secretary of State's office and could properly be noticed judicially by the court.").

[26] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at \*7 (Del. Ch. May 20, 2016) (internal quotations omitted).

*A. The Unlevered, After-Tax Free Cash Flow Projections*

I turn first to Plaintiff's claim regarding the UFCF, which was the subject of Plaintiff's application for preliminary injunctive relief.

In their briefing the Plaintiff remakes arguments similar to those previously considered in this action. The Plaintiff argues that the Defendants made selective disclosure of certain financial projections in the Proxy and "intentionally excised [what the Plaintiff describes as] Millennial's UFCF—despite the fact that LUMA's Discounted Cash Flow Analysis was specifically based on these figures."[27] They assert that the UFCF, and the components that went into it were material because Millennial "stockholders were asked to exchange their ownership stake in the Company and forego the Company's future cash flows in exchange for all-cash consideration."[28] They argue that the UFCF and its components were "even more significant than usual" here because two of LUMA's disclosed cash flow projections, which used UFCF as an input, resulted in a price per share of $0.00.[29] Additionally, they repeat their argument that these projections are not banker formulated projections but, essentially, management figures.[30] They allege LUMA took UFCF components projected by management and "using no meaningful

---

[27] Pl's Answering Br. 19 (citing Second Am. Compl. ¶¶ 92–93, 101).
[28] *Id.* at 21 (citing Second Am. Compl. ¶105).
[29] *Id.* (citing Second Am. Compl. ¶ 105).
[30] *Id.* at 22–24 ("[S]emantic gamesmanship aside, the UFCF figures were for all intents and purposes derived by Millennial's management.").

9

independent judgment of any kind, plugged them into a calculator to arrive at the UFCF figures."[31] Under these facts, they contend that the Company had a duty to disclose UFCF, or at the very least, all of the UFCF components provided to LUMA, because the Company cannot escape a duty to provide management projections by simply giving a banker numbers to plug into a formula for the banker to merely hit the "equals" button.[32] They allege that because "*some* management projections were disclosed, the Board was required to give materially complete information about *all* of the Company's projections and provide a complete summary of the key inputs relied upon by LUMA."[33]

The Defendants argue that the UFCF figures were derived by LUMA.[34] They assert that the cases cited by the Plaintiff, for the proposition that management cannot avoid its duty to disclose projections by simply handing inputs to bankers for them to perform the ministerial task of hitting enter, are distinguishable. They argue those cases involved situations where no cash flows were disclosed.[35] Here however, "all of the cash flow information that was directly prepared by management was disclosed."[36] Further, they assert that the Complaint does not allege that management directed LUMA in selecting the formula, or even knew how

---

[31] *Id.* at 23.
[32] *Id.*
[33] *Id.* at 27–28 (emphasis added).
[34] Transcript of June 30, 2016 Oral Arg. 56:22.
[35] *Id.* at 57:10–11.
[36] *Id.* at 57:13–15.

10

LUMA would treat the components management provided them, or that management had anything to do with LUMA's methodology.[37] Thus "[i]n these circumstances, it simply cannot be said that these were management's numbers."[38] Because these were banker prepared numbers and management's best projections were disclosed, the Defendants argue, the law is clear that the UFCF were not material and need not be disclosed.

Even if I were to find that the UFCF disclosures—contrary to my earlier determination on the record at the preliminary injunction hearing—constitute a material lack of disclosure, Plaintiff's UFCF claim must fail. The Plaintiff has failed to plead facts such that it is reasonably conceivable that the allegedly incomplete disclosure was made by the board disloyally or in bad faith, as is required to sustain this claim post-close. The only conflict that the Plaintiff alleges as to six of the directors—all except Millennial CEO, Michael Barrett[39]—is that they held stock options that vested in the event of a transaction, providing a lucrative payout.[40] When pressed at oral argument, the Plaintiff elaborated that the Director Defendants must have wanted to accelerate their vesting because they faced "risk."[41] The

---

[37] *Id.* at 58:21–59:12.
[38] *Id.* at 59:19–21.
[39] As to Barrett, the Plaintiff alleges that he had a significant prior employment relationship with AOL, which caused the board to favor AOL, and that he stood to gain "an additional 12 months' salary of $476,000, 100% of his restricted stock units, and 100% of his stock options" in connection with the Transaction. Second Am. Compl. ¶¶ 12–14, 21, 65.
[40] *Id.* at ¶ 12.
[41] Transcript of June 30, 2016 Oral Arg. 40:23–41:12.

Plaintiff conceded that he did not know why the directors would cash out at lower price, rather than wait to maximize the value of the Company.[42] Instead, the Plaintiff argued that he need not answer that question at the motion-to-dismiss stage, without the aid of further discovery.

Under Delaware law, directors are presumed to be independent, disinterested, and faithful fiduciaries.[43] While a plaintiff need not know and articulate the exact motive of directors in order to sustain a claim, the Plaintiff does bear the burden to allege facts that rebut the presumption afforded to directors—that is, to demonstrate that it is *reasonably conceivable* that the board acted in bad faith or disloyally. Here, the single allegation as to the six directors (other than Barrett) is insufficient as a matter of law to do so. It is well-settled that where the interests of directors and stockholders are aligned, as here, the accelerated vesting of shares in a merger does not create a conflict of interest.[44] Additionally, even if an incongruency of interest had been plead, the Plaintiff has also failed to allege how the payouts that these directors stood to earn were material to them.[45] I need not address the allegations

---

[42] *Id.* at 39:21–40:4.

[43] *See, e.g.*, *Beam ex rel. Martha Stewart Living Omnipedia, Inc. v. Stewart*, 845 A.2d 1040, 1048–49 (Del. 2004).

[44] *See Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *8 (Del. Ch. Nov. 30, 2007) ("The accelerated vesting of options does not create a conflict of interest because the interests of the shareholders and directors are aligned in obtaining the highest price.") (internal quotations omitted).

[45] *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del. 1995) ("[A] shareholder plaintiff [must] show the materiality of a director's self-interest to the given director's independence . . . .").

with respect to Barrett; he is only one of seven on the board, and the Plaintiff can only sustain a claim for the breach of the duty of loyalty by pleading facts showing that it is reasonably conceivable that each of a *majority* of the board is conflicted.[46] Finally, I note that Plaintiff's reliance on this Court's decision in *Chen v. Howard-Anderson*[47]—where the Court found that it was unclear at the motion-for-summary-judgment phase whether the alleged disclosure violations in the proxy statement resulted from a breach of loyalty or a breach of care, and declined the motion—is misplaced. The *Chen* court determined that, at that procedural stage, and given the "confounding evidence of the directors' knowledge and the problems that occurred in discovery," it needed further factual development to determine whether and to what extent the 102(b)(7) exculpatory provision applied.[48] That is not the case here.

Because the Plaintiff has failed to allege a reasonably conceivable breach of the duty of loyalty based on self-interest, he can only sustain his claim if he can demonstrate facts supporting an inference that the board acted in bad faith in making its allegedly incomplete disclosure—that is, facts showing an "intentional"

---

[46] *See Plumtree*, 2007 WL 4292024, at *9 ("Even assuming [the plaintiff] was correct, which it is not, and such benefits were sufficient for the Court to infer [the CEO] was interested in the transaction, [the CEO] is only one member of a six person Board. The other five uninterested Individual Defendants constitute a clear majority."); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del. 1993) ("This Court has never held that one director's colorable interest in a challenged transaction is sufficient, without more, to deprive a *board* of the protection of the business judgment presumption of loyalty.") (emphasis added).
[47] 87 A.3d 648 (Del. Ch. 2014).
[48] *Id.* at 693.

dereliction or a "conscious disregard" of duty.[49] The Plaintiff has not met that burden. Again, nothing in the pleadings, considered in the light most favorable to the Plaintiff, suggests bad faith. I note that I found at the preliminary injunction stage that the Plaintiff lacked a colorable claim of non-disclosure, and the Defendants presumably relied on that preliminary conclusion by this Court, which was undisturbed on appeal by the Supreme Court. Nothing in the record creates an inference that the Defendants *deliberately* withheld information or disregarded a manifest duty.[50]

## B. LUMA's Contingent Compensation

I next turn to Plaintiff's claim regarding LUMA's contingent fee. The Plaintiff contends that the Proxy failed to disclose the amount of LUMA's fee that was contingent upon the completion of the Transaction. The Proxy discloses that

> LUMA Securities has acted as financial advisor to the Company in connection with the Merger and will receive a fee of $3.6 million for its services, a *substantial portion* of which is contingent upon the completion of the Merger (the "*Advisory Fee*"). LUMA Securities has also acted as financial advisor to the Board and received a $500,000 fee upon delivery of its opinion, which is not contingent upon the conclusion expressed or the consummation of the Merger (the "*Opinion*

---

[49] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).
[50] The Plaintiff's reliance on this Court's decision in *Doppelt v. Windstream Holdings, Inc.*, 2016 WL 612929 (Del. Ch. Feb. 5, 2016), is unavailing. There, the plaintiff alleged specific facts that the board had knowingly withheld in its proxy: the proxy announced a $0.70 post-transaction dividend target, while the board was planning to slash that target to $0.58 following stockholder approval. Even with such facts, which do not exist here, then-Vice Chancellor Noble remarked that the complaint "test[ed] the limits of the 'reasonably conceivable' standard." *Id.* at *8 n.81.

*Fee*"), provided that such Opinion Fee is partially creditable against any Advisory Fee.[51]

The Plaintiff argues that this "partial" disclosure was "inadequate to inform stockholders of how much of LUMA's fee was contingent upon a transaction coming to fruition," as "what constitutes a 'substantial portion' is highly subjective and open to various interpretations."[52]

As a threshold matter, the Defendants argue that this claim has been waived; it was pled in Plaintiff's first amended complaint, but was abandoned during the course of the expedited proceedings, through Plaintiff's failure to pursue the claim in briefing or argument on his motion for a preliminary injunctive relief. In my letter opinion denying certification of an emergency interlocutory appeal, I remarked that the "number of disclosure violations alleged [in the first amended complaint] is extraordinary," and found that "[b]y the time th[e] preliminary injunction request was submitted, these disclosure violations were abandoned, and are therefore waived, with a single exception" (referring to the claim concerning the unlevered, after-tax free cash flow projections).[53] The Plaintiff, on the other hand, contends that I should not consider the claim waived in this post-close context, arguing first that recent decisions have indicated a disposition toward addressing disclosure

---

[51] Proxy, at 33–34 (emphasis added).

[52] Defs' Answering Br. 17.

[53] *Nguyen*, 2015 WL 5882709, at *1, 3.

claims post-close,[54] and second, that he adequately preserved his right to pursue other disclosure claims post-close during argument on the motion for preliminary injunctive relief.[55] Essentially, the Plaintiff posits that Delaware has recently established a new "regime," under which a plaintiff can elect to bring disclosure claims pre- or post-close, but creating uncertainties in the process which make leeway towards his approach appropriate here.[56]

To be clear, where a plaintiff has a claim, pre-close, that a disclosure is either misleading or incomplete in a way that is material to stockholders, that claim should be brought pre-close, not post-close. There are two aspects to such a claim: the first concerns a stockholder's right to a fully informed vote; and the second is a potential damages claim. While the latter may be remedied post-close, the former is

---

[54] The Plaintiff points to *Chester Cnty. Ret. Sys. v. Collins*, C.A. No. 12072-VCL, at 21:16–23 (Del. Ch. Mar. 14, 2016) (TRANSCRIPT); *Johnson v. Driscoll*, C.A. No. 11721-VCL, at 45:19–46:5 (Del. Ch. Feb. 3, 2016) (TRANSCRIPT).

[55] *See* Prelim. Inj. Hrg. Tr. 11:15–19 ("Defendants also made this reference of frivolity. Nothing here is frivolous, Your Honor. We're moving on the serious disclosure, and whether we have other disclosures in our pleadings, we can do those post-close for quasi-appraisal.").

[56] The Plaintiff argues that recent rulings of this Court cause Plaintiffs' counsel to face a Catch-22: bring disclosure claims pre-close and risk denial of expedition on ground that damages is a sufficient remedy, or bring the claims post-close, and have them dismissed for failure to plead non-exculpated breach of duty. No such dilemma exists, in my view. This Court's jurisprudence makes clear that it is preferable to bring disclosure claims before closing. Such pleadings allow this Court to employ equitable relief to ensure an informed vote of stockholders. Those disclosure claims must, of course, be colorable—otherwise, they could not justify the expense to litigants and the Court of expedition, and in any event could not sustain equitable relief. Non-colorable claims are properly refused expedition.

Post-closing, what may remain are claims for damages. To the extent an improper disclosure was the result of an actionable breach of fiduciary duty on the part of directors, causing damages, a remedy is available post-closing, but as with any claim of breach of fiduciary duty, the plaintiff must plead facts that make it reasonably conceivable that an actionable breach of duty has occurred. That burden is not inconsequential, as the instant matter demonstrates.

16

irretrievably lost following a stockholder vote.[57]    The preferred method for vindicating truly material disclosure claims is to bring them pre-close, at a time when the Court can insure an informed vote.  Because of this interest, a salutary incentive could be provided by considering claims based on disclosure, pled but not pursued pre-close, to be waived.

However, the Defendants argue, and I agree, that regardless of whether I consider this claim waived, it fails on the merits.   Here, the Proxy discloses that a "substantial portion" of LUMA's fee was contingent on the completion of the merger.[58]  This Court has repeatedly held that such a disclosure regarding advisor fees, absent some indication that the fee was exorbitant or unusual, or otherwise improper, is sufficient.[59]

---

[57] *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 360–61 (Del. Ch. 2008) ([T]his Court has explicitly held that a breach of the disclosure duty leads to *irreparable harm.*  On account of this, the Court grants injunctive relief to prevent a vote from taking place where there is a credible threat that shareholders will be asked to vote without such complete and accurate information.  The corollary to this point, however, is that once this irreparable harm has occurred—*i.e.,* when shareholders have voted without complete and accurate information—it is, by definition, too late to remedy the harm.  If the Court could redress such an informational injury after the fact, then the harm, by definition, would not be irreparable, and injunctive relief would not be available in the first place.") (citations omitted) (emphasis added).

[58] Proxy, at 33; *see also*, Second Am. Compl. ¶ 91.

[59] *See, e.g.*, *Cnty. of York Emps. Ret. Plan v. Merrill Lynch & Co.*, 2008 WL 4824053, at *11 (Del. Ch. Oct. 28, 2008) ("It is true that compensation contingent on consummation of the transaction has the potential to influence a financial advisor.  However, that fact was disclosed in the proxy: 'Merrill Lynch has agreed to pay a fee to MLPFS, a *substantial portion* of which is contingent upon the merger being consummated.'   And this Court has held that the precise amount of consideration need not be disclosed, and that *simply stating that an advisor's fees are partially contingent on the consummation of a transaction is appropriate*.  In other words, the Plaintiff has simply not alleged a disclosure violation.") (emphasis added) (citations omitted); *Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *13 (Del. Ch. Nov. 30, 2007) ("The Merger Proxy stated that Jefferies' fees were 'customary' and partially contingent, but did not provide

The Plaintiff points to this Court's decision in *In re Atheros Communications, Inc.*[60] for the proposition that the *level* of contingency of an advisor's fee can be material. There the Court found misleading a disclosure that the investment banker's fee was "substantially contingent" on the deal's closing, when the well-pleaded facts of the complaint showed that nearly all—98%—of the fee was contingent. The Court held that while "[c]ontingent fees are undoubtedly routine," the "percentage of the fee that is contingent exceeds both common practice and common understanding of what constitutes 'substantial,'" and "may fairly raise questions about the financial advisor's objectivity and self-interest."[61] In other words, the Court found that the plaintiff's pleadings *themselves* showed that the proxy was inaccurate, by understating the level of contingency.[62] To my mind, *Atheros* does not undermine the body of cases that hold that, generally, the disclosure that a

---

further details. Without a well-pled allegation of exorbitant or otherwise improper fees, there is no basis to conclude the additional datum of Jefferies' actual compensation, per se, would significantly alter the total mix of information available to stockholders.") (citation omitted).

[60] 2011 WL 864928 (Del. Ch. Mar. 4, 2011).

[61] *Id.* at *8.

[62] *Id.* at *8; *see also In re Alloy*, 2011 WL 4863716, at *11 (Del. Ch. Oct. 13, 2011) ("Although this Court has held that stockholders may have sufficient concerns about contingent fee arrangements to warrant disclosure of such arrangements, that need to disclose does not imply that contingent fees necessarily produce specious fairness opinions. In this case, Plaintiffs provide nothing more than conclusory allegations that the presence of a contingent fee structure must have influenced [the banker], but they do not allege, for example, that the actual compensation received was excessive or extraordinary. In these circumstances, I cannot conclude that a broad salvo against such a common practice, standing alone, supports a reasonable inference that the fairness opinion rendered in this case is so flawed that the [Company's] directors could not have relied upon it in good faith.") (citations omitted).

"substantial portion" of a fee is contingent is sufficient. The Plaintiff here points to no well-pled facts indicating that the fee arraignment falls outside this general rule.[63]

Moreover, as with Plaintiff's other disclosure claim, the Plaintiff has not pled facts such that it is reasonably conceivable that this allegedly incomplete disclosure was made in bad faith. When pressed at oral argument, the Plaintiff described his theory as follows:

> Our theory is that all that information has not been disclosed intentionally to mislead shareholders in approving this transaction, and that the fact that the banker is getting paid a lot of money and that it's contingent on closing goes hand in hand, that that's why they didn't want the free cash flow disclosed.[64]

Beyond alleging, in this conclusory fashion, that the two alleged disclosure violations are related, the Plaintiff has not pled facts creating a reasonable inference that the Director Defendants acted deliberately to knowingly withhold material information regarding the contingent-banker-fee arrangement from the stockholders. The Plaintiff, in declining to pursue this claim pre-close, conceded that the claim was not its "serious" claim,[65] instead choosing only to pursue its disclosure claim regarding the UFCF; it is hard to see how the Defendants, in light of that concession,

---

[63] I note that the other cases cited by Plaintiff—*In re Del Monte Foods Co. Shareholders Litigation*, 25 A.3d 813 (Del. Ch. 2011), and *In re TIBCO Software Inc. Stockholders Litigation*, 2015 WL 6155894 (Del. Ch. Oct. 20, 2015)—did not address *disclosure* claims concerning an advisor's fee.
[64] Transcript of June 30, 2016 Oral Arg. 11:3–9.
[65] Prelim. Inj. Hrg. Tr. 11:15–19.

acted in bad faith in not altering the disclosure; in any event, facts evincing bad faith are not adequately plead.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted. An appropriate Order is attached.

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| AN NGUYEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11511-VCG |
| | ) | |
| MICHAEL G. BARRETT, THOMAS R. | ) | |
| EVANS, ROBERT P. GOODMAN, | ) | |
| PATRICK KERINS, ROSS B. | ) | |
| LEVINSOHN, WENDA HARRIS | ) | |
| MILLARD, JAMES A. THOLEN, AOL | ) | |
| INC., and MARS ACQUISITION SUB, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

AND NOW, this 28th day of September, 2016,

The court having considered Defendants' Motion to Dismiss, and for the reasons set forth in the Memorandum Opinion dated September 28, 2016, IT IS HEREBY ORDERED that Defendants' motion is GRANTED.

SO ORDERED:

/s/ Sam Glasscock III

Vice Chancellor

21