NOT DESIGNATED FOR PUBLICATION

No. 125,555

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In re NIC INC. STOCKHOLDER LITIGATION.


MEMORANDUM OPINION

Appeal from Johnson District Court; JAMES F. VANO, judge. Oral argument held July 11, 2023. Opinion filed January 12, 2024. Affirmed.

*Miles D. Schreiner*, pro hac vice, and *Juan E. Monteverde,* pro hac vice, of Monteverde & Associates PC, of New York, New York, and *Chad C. Beaver*, of Beaver Law Firm, of Kansas City, Missouri, and *Jared A. Rose*, of The Law Offices of Jared A. Rose, of Kansas City, Missouri, for appellants.

*Daniel H.R. Laguardia*, pro hac vice, of Shearman & Sterling LLP, of San Francisco, California, and *Carrie E. Josserand* and *Brian C. Fries*, of Lathrop GPM LLP, of Kansas City, Missouri, for appellees.


Before COBLE, P.J., GARDNER and CLINE, JJ.


PER CURIAM: This appeal arises out of a stockholder challenge to a corporate merger between NIC, Inc. and Tyler Technologies, Inc. NIC stockholders Anthony de Petris and Roxie Allison-Holman (Plaintiffs) allege NIC's CEO and Board (Defendants) breached their fiduciary duties by failing to inform NIC stockholders of all material facts before the stockholders voted to approve the merger. The district court dismissed Plaintiffs' petition after finding Plaintiffs failed to show under Delaware law there were material omissions in the proxy statements provided to stockholders before the vote.

1

Plaintiffs appeal this dismissal, claiming the district court improperly evaluated the allegations in their petition. For one, Plaintiffs contend the court erred by assessing their claims under Delaware substantive law rather than applying Kansas' liberal "notice-pleading" standards. Next, they contend the court improperly shifted the burden of proof under Delaware law by requiring Plaintiffs to show the materiality of the omissions they allege. And, last, they claim the court mistakenly found those omissions immaterial.

We find the district court correctly applied Kansas' procedural standards for evaluating pleadings facing a motion to dismiss. But we agree it erred when it placed the burden of proof on Plaintiffs regarding the materiality of the omissions. That said, we find Defendants satisfied that burden once it shifted back to them. Even accepting Plaintiffs' factual allegations as true—as required under Kansas' procedural law governing motions to dismiss—we do not find they have stated a claim under Delaware law. Plaintiffs provide either conclusory allegations from which we cannot properly infer material facts were omitted from the proxy statements or they cannot show as a matter of law the alleged omitted facts were material to the stockholders' decision. We therefore affirm the district court's dismissal of Plaintiffs' petition.

FACTS

In 2021, the stockholders of NIC, a publicly traded provider of digital government services and payment solutions, voted to approve a merger with Tyler, a publicly traded software company servicing the public sector. NIC is now a wholly owned subsidiary of Tyler, headquartered in Kansas and incorporated in Delaware.

Tyler's president and CEO, Lynn Moore, reached out to Harry Herington, NIC's CEO and Board chair, in late September 2020 to express interest in acquiring NIC. Herington told Moore that NIC was not seeking to be acquired but "noted the natural

alignment of the companies." The two men continued discussing the possibility of a merger between the two companies over the next month.

Herington informed NIC's Board of Tyler's interest in merging the companies in October 2020. The Board determined it would only consider a mainly cash offer which valued NIC at more than $2 billion—the equivalent of at least $30 per share.

Moore sent Herington two offers in November 2020. Herington rejected both because they did not meet the Board's criteria. But he discussed each with Art Burtscher, the Lead Independent Director for NIC and a board member. Soon after, Herington notified the Board of Moore's offers and communication. He called for a special meeting on December 3, 2020, to discuss the proposals. Before the meeting, Moore e-mailed Herington, outlining his vision for the merger. He suggested there would be roles for NIC's leadership team, including Herington, if Tyler acquired NIC.

Herington briefed the Board on the proposals and discussions with Moore, including the e-mail proffering a leadership position. He also briefed the Board on his discussion with investment bankers at Cowen and Company, LLC, whom the Board later engaged to advise NIC in connection with the merger. After discussing how to respond to future offers from Tyler, the Board instructed Herington that only future offers over $2 billion—$30 per share—should be brought to the Board for consideration.

A week later, Moore sent Herington an all-cash proposal for Tyler to acquire NIC at $31.35 per share. In response, Herington scheduled multiple special meetings for the Board to discuss the proposal. The Board deliberated and rejected Tyler's proposal but authorized Herington to counteroffer at $39 per share. At the Board's request, Cowen also identified four other potential buyers who may be able to meet the Board's criteria. The Board instructed Cowen and Herington to contact these companies to discuss a potential transaction. While one of these companies indicated interest in discussing a potential

transaction in response to Herington's call, it failed to respond to later communication attempts. The remaining three companies all stated they were not interested in pursuing a transaction with NIC.

On January 12, 2021, Tyler made its "'best and final' offer" of $34 per share in cash. The Board voted to accept the proposal the next day. After about a month of conducting due diligence and discussing post-merger employment, the NIC Board unanimously voted to finalize and execute the merger agreement.

As required by the United States Securities and Exchange Commission (SEC), NIC and its Board filed a proxy statement providing material disclosures to NIC stockholders before the stockholder vote for the sale or merger of the corporation. After the merger was announced and around the time NIC filed the proxy statement, stockholders in four venues filed seven nearly identical complaints, each challenging the sufficiency of the proxy disclosures. One of these lawsuits sought a temporary injunction seeking to halt the stockholder vote until the proxy statement's alleged deficiencies were remedied.

NIC filed a supplemental proxy statement with the SEC a few weeks later, on April 9, 2021. After the supplemental proxy statement was filed, five of the seven suits, and the motion for temporary injunction, were dropped.

On April 19, 2021, 77.5% of NIC stockholders voted to approve the merger.

The district court consolidated the two remaining lawsuits a few months later. Plaintiffs then filed a consolidated petition on July 12, 2021, which challenged the merger process and sought damages based on claims of breaches of fiduciary duties.

Defendants then moved to dismiss this petition and Plaintiffs' suit. They argued the merger was unchallengeable under Delaware law because the stockholders who voted to approve the merger were fully informed, uncoerced, and disinterested. In this vein, they also argued Plaintiffs failed to allege facts supporting an inference that any defendant breached their fiduciary duties. Plaintiffs responded that they adequately alleged a breach and argued Defendants had the burden to show NIC stockholders were fully informed.

The district court dismissed the action with prejudice after finding Plaintiffs' allegations failed to show the proxy statements were materially deficient under Delaware and Kansas law. The court reasoned that while Kansas procedural pleading rules apply, "when the Plaintiffs have provided detailed facts that do not state a claim under the substantive Delaware law, then the Petitions should be dismissed."

ANALYSIS

While Plaintiffs acknowledge Delaware law governs the substantive legal issues involved, they contend the district court misapplied it. They first argue the court did not take Kansas' procedural "notice-pleading" standards into account when reviewing their petition. They next argue the court erred by mistakenly shifting the burden of proof to Plaintiffs to show the materiality of the proxy statements' omissions and by finding those omissions were immaterial under Delaware law.

Plaintiffs' challenges present legal questions subject to unlimited review. *Jayhawk Racing Properties v. City of Topeka*, 313 Kan. 149, 154, 484 P.3d 250 (2021). We first address the procedure the district court employed to evaluate Plaintiffs' petition, then we look to its analysis of the legal sufficiency of Plaintiffs' claims.

5

*The application of Kansas procedural law*

Kansas requires notice pleading, which means the petition need only include a "short and plain statement of the claim showing that the pleader is entitled to relief" and a demand for relief. K.S.A. 2022 Supp. 60-208(a)(1). District and appellate courts construe a petition facing a motion to dismiss the same way: We must assume the factual allegations are true and ask whether those factual allegations (along with any inferences reasonably drawn from them) state a valid legal claim. But while we must accept a plaintiff's description of what has occurred factually, we need not accept the plaintiff's conclusions about the legal meaning of those facts. See *Weil & Associates v. Urban Renewal Agency*, 206 Kan. 405, 413-14, 479 P.2d 875 (1971).

If the well-pleaded facts and reasonable inferences state any claim upon which relief can be granted, then dismissal is improper. Dismissal is proper only when the allegations in the petition clearly show the plaintiff does not have a claim. *Kudlacik v. Johnny's Shawnee, Inc.*, 309 Kan. 788, 790, 440 P.3d 576 (2019).

Defendants moved to dismiss Plaintiffs' petition under K.S.A. 2022 Supp. 60-212(b)(6) for failure to state a claim. Plaintiffs contend the district court failed to apply Kansas' notice pleading standards because it reviewed the merits of their claims under Delaware law when deciding whether Plaintiffs stated a claim. According to Plaintiffs, the court should have limited its analysis to "whether the Petition sufficiently apprised Defendants of the facts upon which Plaintiffs' claims are based."

But Plaintiffs overlook the duality of the defense of failure to state a claim under K.S.A. 2022 Supp. 60-212(b)(6). A pleading can fail to state a claim in two ways: (1) It fails to state enough facts to apprise a defendant of the claims asserted against it (a factual insufficiency) or (2) its facts, even when taken as true, fail to state a legally actionable claim (a legal insufficiency). *Febert v. Upland Mutual Ins. Co.*, 222 Kan. 197, 199, 563

P.2d 467 (1977) ("A party is required to set forth facts sufficient to state a claim upon which relief can be granted."); *Hokanson v. Lichtor*, 5 Kan. App. 2d 802, 810, 626 P.2d 214 (1981) ("The purpose of K.S.A. 60-212[b][6] is to dismiss legally insufficient pleadings even though everything they plead is taken as true.").

Defendants did not allege that Plaintiffs' petition failed to plead sufficient facts—Defendants argued that Plaintiffs' claims were not supported by the facts they pled or the language of the proxy statements. Since Defendants asserted that Plaintiffs' claims were legally—not factually—insufficient, the district court correctly evaluated whether Plaintiffs' petition stated a legally cognizable claim. And since the parties agreed Delaware law applies, the court did not err by looking at whether Plaintiffs' allegations stated any claim for relief under Delaware law.

Even when viewing a petition under Kansas' liberal pleading standard, courts must still apply substantive law to determine whether any claim for relief can be granted. For example, in *Weil & Associates*, the Kansas Supreme Court affirmed the district court's dismissal of a breach of contract claim because the court was "unable to see, under the facts of this case, the existence of a contract." 206 Kan. at 414. The court reached this conclusion after accepting the plaintiffs' facts and inferences as true and then applying substantive Kansas contract law to those facts. Relying on the petition's factual allegations about the transactions and dealings between the parties, the court found the pleaded facts did not show a contract existed to support a claim of breach. 206 Kan. at 414-15.

While Kansas requires courts to liberally construe the allegations in a petition when undertaking this analysis, this simply means we must assume the truth of the facts that are pled, and any inferences reasonably drawn from those facts. If those assumed facts and inferences show the plaintiff is not entitled to relief as a matter of law, then the petition must be dismissed. *Kudlacik*, 309 Kan. at 790.

7

The district court acknowledged that it considered facts in documents incorporated by reference in Plaintiffs' pleadings and response (namely, the proxy statements), but it did not treat Defendants' motion as one for summary judgment. No party objects to this approach, and neither do we. While normally a court may only consider the plaintiff's petition and any documents attached to it, a court may consider an unattached and undisputedly authentic document central to the plaintiff's claim without transforming a motion to dismiss into a motion for summary judgment. *Minjarez-Almeida v. Kansas Bd. of Regents*, 63 Kan. App. 2d 225, 242, 527 P.3d 931 (2023). Therefore the court properly considered the language of the proxy statements when evaluating the legal sufficiency of Plaintiffs' claims.

The district court did not dismiss Plaintiffs' petition because it did not believe Plaintiffs' factual allegations; it dismissed it because those allegations, even assuming them to be true, would not support a claim for relief under Delaware law. We see no legal error in the procedure the district court employed, nor do we find that it ignored Kansas law in evaluating Plaintiffs' petition.

*The applicable standards under Delaware substantive law*

Defendants sought dismissal of Plaintiffs' claims because they claimed "the Merger was ratified by a majority vote of disinterested and fully informed stockholders." See *Corwin v. KKR Financial Holdings, LLC*, 125 A.3d 304, 308-12 (Del. 2015). Under Delaware law, "where the stockholder-owners of a corporation are given an opportunity to approve a transaction, are fully informed of the facts material to the transaction, and where the transaction is not coercive, there is no agency problem for a court to review, and litigation challenging the transaction is subject to dismissal under the business judgment rule." *In re USG Corporation Stockholder Litigation*, No. 2018-0602-SG, 2020 WL 5126671, at *l (Del. Ch. 2020) (unpublished opinion). The business judgment rule stands for the proposition that a court should not substitute its business judgment for that

8

of the directors, or question business decisions with the benefit of hindsight, unless a board's decision cannot be attributed to any rational business purpose. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971); see *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 416-17, 77 P.3d 130 (2003).

Plaintiffs contend Defendants are not entitled to the protection of the business judgment rule because the proxy statements were materially incomplete and misleading, meaning the stockholders were not fully informed. And they argue the district court erred by making Plaintiffs prove the materiality of the omissions, rather than making Defendants prove the stockholders were fully informed.

Plaintiffs are correct that the district court relied on an outdated test which does not accurately reflect the process Delaware courts currently use to analyze the question at hand—that is, whether the stockholders were fully informed of the facts material to the transaction. In its opinion, the district court quoted language from *Dent v. Ramtron International Corporation*, No. 7950-VCP, 2014 WL 2931180 (Del. Ch. 2014) (unpublished opinion), which explained the elements of a disclosure claim, like Plaintiffs', as follows:

> "To plead adequately a disclosure claim, a plaintiff 'must allege that facts are missing from the Proxy, identify those facts, [and] state why they meet the materiality standard and how the omission caused injury.' The plaintiff bears the burden of demonstrating materiality." 2014 WL 2931180, at *10.

But the Delaware Supreme Court has since adopted the "*Corwin* cleansing" doctrine after *Firefighters' Pension System of City of Kansas City, Missouri Trust v. Presidio, Inc.*, 251 A.3d 212, 254-55 (Del. Ch. 2021). Under this doctrine, once a plaintiff identifies an alleged disclosure violation, the defendant bears the burden to show the stockholders were fully informed to claim the protection of the business judgment

rule. This means Defendants must show each alleged deficiency fails as a matter of law. At the pleading stage, the operative question is whether the complaint "'supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading.'" *Goldstein v. Denner*, No. 2020-1061-JTL, 2022 WL 1671006, at *19-20 (Del. Ch. 2022) (unpublished opinion) (quoting *Morrison v. Berry*, 191 A.3d 268, 282 [Del. 2018]).

Delaware courts define materiality in this context as follows:

"A fact is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important' when deciding whether to express approval. The test does not require 'a substantial likelihood that [the] disclosure . . . would have caused the reasonable investor to change his vote,' or not tender the investor's shares. Rather, the question is whether there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the '"total mix"' of information made available.' [Citations omitted.]" *Goldstein*, 2022 WL 1671006, at *19.

But the materiality test "'does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote.'" *Morrison v. Berry*, 191 A.3d 268, 282-83 (Del. 2018).

With these standards in mind, we now turn to whether Defendants have shown Plaintiffs' disclosure claims are legally insufficient under Delaware law. Plaintiffs alleged nine disclosure deficiencies at the district court level; yet they raise only five on appeal. Therefore, our review is limited to the five claims Plaintiffs have preserved and we find the remainder of their claims abandoned. See *National Bank of Andover v. Kansas Bankers Sur. Co.*, 290 Kan. 247, 281, 225 P.3d 707 (2010) (issues not briefed on appeal found waived or abandoned).

1. *Omissions related to communications between Herington and Tyler*

To begin, Plaintiffs allege the proxy statements "fail[ed] to provide any information regarding when the [NIC] Board first learned that Defendant Herington lied to or misled them at the January 29, 2021 board meeting by telling them that Herington had not engaged in any discussions with Tyler regarding future employment for NIC's senior management team." They claim this nondisclosure was material "because it relates directly to the Board's failure to fulfill its fiduciary obligation to properly oversee Herington and the sales process."

Defendants counter that Plaintiffs failed to allege facts supporting their conclusion that Herington lied to or misled the Board or that the Board determined Herington had lied to or misled them. This point has merit. Plaintiffs ask us to not only ignore the clarifying disclosures in the supplemental proxy statement, but to also assume those disclosures are untrue. We cannot stretch Kansas' liberal pleading standards that far.

Among other information, the original proxy statement provided a timeline which detailed communications between Moore and Herington and Herington and NIC Board members regarding a potential merger of Tyler and NIC. These disclosures included the following information:

> "On November 29, 2020, Mr. Moore sent Mr. Herington an email outlining Mr. Moore's vision for how the two companies would be structured after an acquisition, indicating there that would be roles for NIC's leadership team and that Mr. Herington would have a role in Tyler's executive management. Mr. Herington responded by informing Mr. Moore that NIC was not seeking to be acquired by Tyler, and that NIC did not consider an acquisition by Tyler as a viable possibility. Mr. Herington indicated that NIC was focused on executing NIC's strategy as a stand-alone independent public company, including completing NIC's 2021 business plan and budget, and that NIC had not speculated on what a potential combination would look like or on what role its leadership team would have in a combined company."

11

The original proxy statement also noted that Herington briefed the Board four days later, on December 3, 2020, on his discussions with Moore.

In describing a January 29, 2021 meeting between Herington, the NIC Board, and NIC's general counsel, after a draft merger agreement had been exchanged, the original proxy statement said:

> "In response to a question from the NIC board of directors, Mr. Herington informed the NIC board of directors that Tyler had not made any statements regarding future employment for NIC's senior management team. Mr. Herington indicated that no such conversations had taken place and then requested that the NIC board of directors authorize him to engage in discussions with Tyler regarding employment arrangements for NIC's senior management team. The NIC board of directors provided Mr. Herington with this authorization."

The supplemental proxy statement clarified that Herington told the Board about the November 29 e-mail at the December 3 meeting. It also modified the above paragraph from the original proxy statement as follows:

> "In response to a question from the NIC board of directors, Mr. Herington informed the NIC board of directors that **he had not engaged in any discussions with** Tyler ~~had not made any statements~~ regarding future employment for NIC's senior management team,~~.~~ ~~Mr. Herington indicated that no such conversations had taken place~~ and then requested that the NIC board of directors authorize him to engage in **such** discussions ~~with Tyler regarding employment arrangements for NIC's senior management team~~. The NIC board of directors provided Mr. Herington with this authorization."

Plaintiffs characterize the supplemental proxy information as a "partial disclosure" for its failure to describe "the nature and substance of other employment promises provided to Herington as he was guiding the Board toward a deal with his preferred buyer." But the unilateral suggestion Moore e-mailed Herington early in the negotiations

does not provide sufficient factual basis for us to infer that other, undisclosed promises were made, particularly when the supplemental proxy statement unequivocally states no such discussions occurred.

Plaintiffs' assertion that Herington lied about his communications with Tyler regarding future employment opportunities is a conclusory allegation that does not reasonably follow from the description of what happened. Their petition simply assumes Herington lied and concludes the legal result is a breach of candor. While we must assume the truth of the well-pleaded facts in the petition, we need not "accept conclusory allegations on the legal effects of events the plaintiff has set out if these allegations do not reasonably follow from the description of what happened, or if these allegations are contradicted by the description itself." *Weil & Associates*, 206 Kan. at 413-14.

The proxy statements informed stockholders about Moore's November 29, 2020 e-mail to Herington stating there would be future roles for Herington and NIC's leadership team. And the proxy statements described this e-mail as a unilateral offer which Herington told the Board about four days later and clarified no other discussions occurred regarding employment of NIC senior management. Plaintiffs' conclusion that Herington must have lied, and the Board must have known about it, does not reasonably follow from the facts they pled or the language of the proxy statements on which they rely.

Rather than arouse suspicion, as Plaintiffs suggest, the supplemental language provides clarity to an otherwise misleading statement: since Tyler made a unilateral offer of employment to NIC senior management early in the negotiations—which was disclosed in both proxy statements—then it would be misleading to say Tyler had not made statements about future employment. The amended language of the supplemental proxy statement clarifies the disclosed facts rather than supporting an inference that either Herington or the Board failed to disclose facts.

13

This situation is also not like the one relied on by Plaintiffs in *In re Atheros Communications, Inc.*, No. 6124-VCN, 2011 WL 864928, at *11-12 (Del. Ch. 2011) (unpublished opinion). The proxy statement in *In re Atheros Communications, Inc.* incorrectly stated the CEO had not discussed future employment with his company's acquiror. Unlike this case, the CEO in *In re Atheros Communications, Inc.* engaged in employment offer discussions with the acquiror, but the proxy statement did not disclose this fact. Here, the proxy statement disclosed the unilateral offer for future employment, while also disclosing the timeline of when the Board learned of it and clarifying that Moore and Herington had not discussed it.

Since we find no facts in Plaintiffs' petition from which we can reasonably infer the NIC stockholders were misled on this issue, we find no error in the district court's dismissal of this claim.

2. *Omissions related to Herington's separation agreement*

While on the one hand, Plaintiffs argue Herington failed to disclose communications about his intended continued employment after the merger, on the other hand they argue Herington failed to disclose his discussions with Tyler about his intended retirement post-merger. Setting aside the apparent internal inconsistency of these arguments, we again find Plaintiffs failed to plead facts sufficient to support an inference of nondisclosure.

According to Plaintiffs' petition, Herington executed a Separation Agreement with Tyler one month after the proxy statements, under which Herington retired and received a lump-sum payment from Tyler. Plaintiffs allege the proxy statements were deficient for "fail[ing] to disclose the discussions leading up to execution of the Separation agreement." Plaintiffs contend Herington was required to disclose "to what extent the

14

promise of the Separation Compensation infested the process and motivated Defendant Herington to put his own interests before those of the common stockholders."

First, as Defendants note and Plaintiffs concede, under Delaware law, employment discussions after execution of a merger agreement are immaterial as a matter of law. See *English v. Narang*, No. 2018-0221-AGB, 2019 WL 1300855, at *13 (Del. Ch. 2019) (unpublished opinion) (holding facts surrounding benefits negotiated after the execution of a merger agreement are immaterial). Here, Tyler and NIC executed their Merger Agreement on February 9, 2021, and Herington and Tyler entered their Separation Agreement on April 16, 2021.

On appeal, Plaintiffs attempt to skirt this rule by claiming the proxy statements omitted material information about the discussions that occurred "*during* the process *leading up to* the execution of the merger agreement." But this is not what they pled—the petition only asserts that "the Proxy fails to disclose the discussions leading up to execution of the Separation Agreement between Defendant Herington and Tyler on the Closing Date, whereby Defendant Herington retired and received a lump-sum payment of $1.55 million from Tyler."

The difference is problematic for Plaintiffs because the Separation Agreement was executed more than two months after the Merger Agreement was executed. They pled no facts supporting a reasonable inference that discussions regarding the Separation Agreement occurred before the execution of the Merger Agreement, much less facts from which we could infer any such discussions that would be material to NIC stockholders. They simply allege "Herington certainly was aware" negotiations were occurring regarding the Separation Agreement due to "the nature and complexity of such an agreement," and, therefore, "Herington was required to provide shareholders with a complete and candid disclosure regarding this issue." These conclusory allegations are insufficient to support their claim.

15

Plaintiffs argue stockholders did not know "the circumstances surrounding the negotiation for and execution of the Separation Agreement," but they posit no explanation or grounds to suggest the "circumstances" were material to stockholders. The Delaware Court of Chancery has held that "'[i]f a disclosure document does not say that the board or its advisors did something, then the reader can infer that it did not happen.'" *English*, 2019 WL 1300855, at *12; see also *In re Sauer-Danfoss Inc. Shareholders Litigation*, 65 A.3d 1116, 1132 (Del. Ch. 2011) ("Omitting a statement that the board *did not* do something is not material, because 'requiring disclosure of every material event that occurred *and* every decision not to pursue another option would make proxy statements so voluminous that they would be practically useless.'"). And Delaware courts have repeatedly abstained from requiring companies to disclose "'play-by-play'" information regarding board negotiations and processes. See *Dent*, 2014 WL 2931180, at *15; see also *In re Sauer-Danfoss*, 65 A.3d at 1130 (holding that the board's "underlying reasons for acting" generally not considered material).

Further, as Defendants note, the original proxy statement disclosed that NIC executives were entitled to receive "'Golden Parachute Compensation'" in connection with the merger, which included estimates of severance and other transaction-related payments. And this disclosure listed Herington by name, along with potential compensation he could receive. Defendants persuasively argue that stockholders received all the relevant information under Delaware law, so we see no error in the district court's dismissal of this claim.

### 3. *Omissions regarding standstill agreements*

In their third claim on appeal, Plaintiffs allege the proxy statements omitted "'which and how many companies were bound by standstill agreements, including the prospective financial buyer that had previously submitted a proposal for the Company.'" But they provide no factual basis to infer that any company other than Tyler was subject

16

to a standstill agreement—and the proxy statements disclosed that "'Tyler and NIC entered into [a] nondisclosure agreement on January 14, 2021 . . . which included a one year standstill provision.'"

The proxy statements disclosed NIC contacted five potential buyers:  Tyler, Company A, Company B, Company C, and Company D. The supplemental proxy statement specified that "none of Company A, Company B, Company C or Company D are subject to a standstill agreement with NIC." As for "'the prospective financial buyer that had previously submitted a proposal for the Company,'" this was the potential buyer mentioned in the proxy statements who was interested in purchasing NIC in 2018. The proxy statements disclosed that NIC's Board voted not to pursue the proposal. Plaintiffs provide no plausible basis to infer the 2018 prospective buyer might still be bound by a standstill agreement when such bid was denied three years earlier.

Plaintiffs spend much of their brief on this issue describing the artificial restrictions that standstill agreements place on merger transactions, and they cite a string of Delaware cases requiring that such agreements be disclosed to stockholders. Yet they provide no factual basis to infer the existence of any undisclosed agreements. Again, Plaintiffs stretch Kansas' liberal pleading rules too far by asking us to accept the truth of their unsupported conclusions and unreasonable inferences. This we cannot do.

Plaintiffs plead no facts from which we could infer that other standstill agreements existed which should have been disclosed to stockholders. Therefore we find the district court did not err in dismissing this claim.

4. *Omissions regarding the premium paid analysis*

Next, Plaintiffs argue the proxy statements failed to disclose sufficient information about a financial analysis conducted by Cowen, a third party NIC engaged to act as the exclusive financial advisor for the merger.

The proxy statements disclosed that "Cowen reviewed and analyzed, using publicly available data obtained from Thomson SDC databases and public company filings, the premiums paid in 65 public target M&A transactions of $1 to $5 billion in enterprise value from January 1, 2017 to December 31, 2020." From there, "Cowen calculated the average premium of the price paid in such transactions relative to the target company's closing share price one day prior and four weeks prior to the announcement [date] of the transaction."

Put more simply, Cowen reviewed the premium Tyler agreed to pay—at $34 per share—with premiums paid by 65 other acquiring corporations. Using the averages of the 65 companies, Cowen created a range of premiums from the 25th percentile to the 75th percentile. Cowen ultimately concluded that $34 per share implied a premium of 15.9% to NIC's enterprise value. And according to the proxy statements, this percentage fell within the range of premiums paid in recent comparable transactions.

In their petition, Plaintiffs allege the proxy statements omitted "each of the 65 transactions, and the low, high, and median premiums observed." Accordingly, the summary provided in the proxy statements "omitted information that was critical for shareholders to properly assess the legitimacy of the analysis and recognize its flaws."

Defendants counter that Plaintiffs "make no effort to explain why this information would be important to stockholders," and they "make no factual allegation or explanation

18

as to what the identities of each of the analyzed transactions would have added for the stockholders."

Defendants make a good point. Under Delaware law:

"[W]hen the board relies on the advice of a financial advisor in making a decision that requires stockholder action, those stockholders are entitled to receive in the proxy statement 'a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely.'" *In re Trulia, Inc. Stockholder Litigation*, 129 A.3d 884, 900 (Del. Ch. 2016).

Yet the *In re Trulia, Inc.* court found "[a] fair summary . . . is a *summary*." 129 A.3d at 900. And the fair summary need not include all the data necessary for stockholders to perform individual valuations:

"By definition, [the summary] need not contain all information underlying the financial advisor's opinion or contained in its report to the board. Indeed, this Court has held that the summary does not need to provide sufficient data to allow the stockholders to perform their own independent valuation. The essence of a fair summary is not a cornucopia of financial data, but rather an accurate description of the advisor's methodology and key assumptions. In my view, disclosures that provide extraneous details do not contribute to a fair summary and do not add value for stockholders." 129 A.3d at 900-01.

The *In re Trulia, Inc.* court supported its findings with ample Delaware caselaw establishing that such detailed information is contrary to the purpose of including only a summary. See, e.g., *In re Micromet, Inc. Shareholders Litigation*, No. 7197-VCP, 2012 WL 681785, at *11 (Del. Ch. 2012) (unpublished opinion) ("Stockholders are entitled to 'a fair summary of the substantive work performed by the investment bankers,' but 'Delaware courts have repeatedly held that a board need not disclose specific details of the analysis underlying a financial advisor's opinion.'"); *In re Cogent, Inc. Shareholder*

*Litigation*, 7 A.3d 487, 511 (Del. Ch. 2010) (holding stockholders have a right to fair summary, but not to minutiae, and rejecting requests for additional disclosures); *Ryan v. Lyondell Chemical Co.*, No. 3176-VCN, 2008 WL 2923427, at *20 & n.120 (Del. Ch. 2008) (unpublished opinion) (finding a fair summary did not require disclosure of all projections, as long as it disclosed description of valuation exercises, key assumptions, and range of values generated; but noting that the failure to disclose that the financial advisor used a significantly higher weighted average cost of capital [WACC] in its calculation than management's WACC estimate, even when it was using management's other financial projections, could constitute a disclosure violation), *rev'd on other grounds* 970 A.2d 235 (Del. 2009); see also *David P. Simonetti Rollover IRA v. Margolis*, No. 3694-VCN, 2008 WL 5048692, at *9-10 (Del. Ch. 2008) (unpublished opinion) (distinguishing a case in which a proxy statement was deficient because it did not disclose "'*any* substantive portions' of the bankers' work"); *In re MONY Group Inc. Shareholder Litigation*, 852 A.2d 9, 28 (Del. Ch. 2004) ("The plain meaning of 'summary' belies the Stockholders' interpretation.").

Plaintiffs pled that disclosure of the details supporting Cowen's summary was "critical for shareholders to properly assess the legitimacy of the analysis and recognize its flaws." Not only do they provide no factual basis to question the legitimacy of Cowen's analysis, but, under Delaware law, such granular information is not material. Stockholders are not entitled to sufficient information to conduct their own review of Cowen's analysis. They are entitled to a "fair summary," and including such information in the proxy statements would belie the purpose of including a summary. See *In re Trulia, Inc.*, 129 A.3d at 900-01.

Delaware courts guard against "informational bloat" in proxy statements, recognizing that "too much disclosure can be a bad thing." *In re Delphi Financial Group Shareholder Litigation*, No. 7144-VCG, 2012 WL 729232, at *18 (Del. Ch. 2012) (unpublished opinion). Instead, Delaware law seeks to draw a reasonable line "'or else

20

disclosures in proxy solicitations will become so detailed and voluminous that they will no longer serve their purpose.'" 2012 WL 729232, at *18. We find the district court drew a reasonable line here.

Plaintiffs attempt to argue the information is material by relying on a fairly dated and readily distinguishable case: *Glassman v. Wometco Cable TV, Inc.*, No. 7307, 1989 WL 1160 (Del. Ch. 1989) (unpublished opinion). In *Glassman*, a former stockholder challenged a cash-out merger of Wometco Cable TV, Inc. in which he and the other public stockholders were cashed out without any stockholder vote. The Delaware court denied a motion to dismiss and motion for summary judgment on whether the Wometco Cable Board failed to disclose material information it had relied on to approve the cash-out merger. 1989 WL 1160, at *1, 5.

The *Glassman* stockholder contended the Wometco Cable Board should have disclosed information it possessed as to recent sales of comparable cable television systems which did not compare favorably with the price being offered to Wometco Cable's public shareholders. After recognizing that "disclosure standards applicable to information statements distributed to shareholders in a going-private or freeze-out transaction are even greater than those which apply to proxy statements where there is to be a shareholder vote," the Delaware court found a genuine issue of material fact existed as to whether the Wometco Cable Board had failed to disclose material information. 1989 WL 1160, at *3-4. Important to this decision, however, was the stockholder information statement disclosure which "indicated that the [Wometco Cable] Board had expanded its use of the comparable sales data beyond their merely being used by its investment advisors in arriving at their opinions." 1989 WL 1160, at *4. That is, the Delaware court found the Wometco Cable Board analyzed the comparable transactions in arriving at its opinion that the merger consideration was fair to the minority shareholders involved instead of just relying on the independent advisors' analysis. 1989 WL 1160, at *4-5.

21

Unlike *Glassman*, Plaintiffs do not claim and the proxy statements do not disclose that the NIC Board conducted its own analysis of the comparative transaction data, nor was the NIC and Tyler merger a cash-out merger subject to stricter disclosure standards. Further, the proxy statements here provided more detail than what the stockholders received in *Glassman* and that detail provided the information that was material to their decision. The proxy statements defined Cowen's comparisons as "65 public target M&A transactions of $1 to $5 billion in enterprise value from January 1, 2017 to December 31, 2020." Those statements then informed stockholders of the premium they would receive compared to the premiums received by other stockholders in recent mergers. Thus, NIC stockholders were fully informed on whether the comparison premiums were higher or lower than the premium they would receive upon Tyler's acquisition of NIC.

Other than using the information to "check Cowen's work," Plaintiffs proffer no explanation for how disclosure of these underlying facts would alter the total mix of information given to stockholders. As it is, stockholders were informed that the premium they would receive was on the lower end of the implied range of premiums. Even so, stockholders voted to approve the merger. Including the omitted information would not change the information stockholders already had regarding whether the premium they would receive was like the 65 other recent transactions. We therefore find the district court did not err in dismissing this claim.

5. *Omissions regarding Wall Street consensus forecasts*

Last, Plaintiffs argue the proxy statements failed to disclose "the Wall Street consensus forecasts" that "Cowen and Defendants specifically compared [to] management's projections." On appeal, Plaintiffs argue the proxy statements failed to disclose the "specific analysts' forecasts utilized by Cowen in the Wall Street Consensus Forecast Analysis." They argue the analysts' forecasts were material because they formed

22

the "basis of an important valuation analysis . . . that relate directly to assessing the fairness of the Merger Consideration."

The proxy statements informed NIC stockholders that

> "[i]n calculating the implied present value of the future price per share of NIC common stock, Cowen first calculated the implied future enterprise value of NIC by multiplying NIC's estimated NTM [next twelve months] adjusted EBITDA [earnings before interest, taxes, depreciation, and amortization], based on the NIC forecasts, by multiples ranging from 14.6x to 16.6x, which range was selected based on Cowen's professional judgment and experience, and corresponds to the NTM EBITDA . . . of 15.6x, plus or minus 1.0x."

Relevant to this claim, the proxy statements informed stockholders that Cowen used the Wall Street consensus estimate of NIC's 2021 EBITDA to determine the NTM EBITDA multiple. That multiple was used to calculate NIC's "implied future enterprise value."

Assuming Plaintiffs met their pleading standard, Defendants persuasively argue the omitted information "is decidedly immaterial as a matter of law."

As mentioned above, stockholders of Delaware corporations are entitled to a "fair summary" of a financial advisor's work, which does not include "sufficient data to allow the stockholders to perform their own independent valuation." *In re Trulia, Inc.*, 129 A.3d at 900-01. And "[t]he essence of a fair summary is not a cornucopia of financial data, but rather an accurate description of the advisor's methodology and key assumptions." 129 A.3d at 901.

The Delaware Court of Chancery denied similar claims by a stockholder in a different merger, who argued the proxy statement failed to disclose certain projections that were used to derive the implied share prices, including the Wall Street projections

23

that the corporation consented to using. *In re Family Dollar Stores, Inc. Stockholder Litigation*, No. 9985-CB, 2014 WL 7246436, at *21-22 (Del. Ch. 2014) (unpublished opinion). The Delaware court held there was not "a reasonable probability that a reasonable stockholder would think that the undisclosed (but publicly available) analyst projections—as opposed to the disclosed ranges of implied share prices derived them— would significantly alter the total mix of information available in the Proxy." 2014 WL 7246436, at *22. Instead, the court likened the claim to the one in *Dent*: "'This is simply a "tell me more" request that, unlike a viable disclosure claim, fails to identify how the analysis is misleading or incomplete if it does not disclose specifically which publicly available source of information [the company's financial advisor] used to do its work.'" 2014 WL 7246436, at *22 n.160 (quoting *Dent*, 2014 WL 2931180, at *13).

Plaintiffs make a similar "'tell me more'" claim here. As Defendants argue, Plaintiffs do not explain why identifying this information would alter the total mix of information available to stockholders. Plaintiffs do not claim the provided summary of the forecasts was misleading nor do they explain how the forecasts would have impacted the stockholders' decision.

Defendants also correctly point out that the authority on which Plaintiffs rely is distinguishable. For example, Plaintiffs cite *Helaba Invest Kapitalanlagegesellschaft mbH v. Fialkow*, No. 2683-VCL, 2008 WL 1128721, at *4 (Del. Ch. 2008) (unpublished opinion), for the proposition that financial projections used by an advisor in connection with its fairness opinion were a material disclosure. But the claim heard in *Fialkow* considered attorney fee awards. 2008 WL 1128721, at *4-5. And the footnote from *In re Staples, Inc. Shareholders Litigation*, 792 A.2d 934, 958 n.44 (Del. Ch. 2001), on which Plaintiffs rely, discussed the nondisclosure of management projections, not third-party forecasts used for the analysis here. As Defendants correctly note, "[f]or evident reasons, internal management projections (which are non-public) are entirely different from Wall

24

Street consensus forecasts (which are public), and they are treated differently by Delaware courts."

Defendants persuasively argue the omitted information would not alter the total mix of information available to stockholders. The Wall Street consensus forecasts were public, analyst projections used by Cowen to reach its own projections. The use of the Wall Street consensus forecasts was disclosed to stockholders—who could access the Wall Street consensus forecasts that were disclosed—and publicly available. Including the same information in the proxy statements would not alter the total mix. And as a result, the district court did not err in dismissing this claim.

CONCLUSION

Motions to dismiss serve the valuable purpose of "streamlin[ing] litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326-27, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989). We find the district court's dismissal of Plaintiffs' petition served that purpose. Even assuming the truth of Plaintiffs' alleged facts and reasonable inferences that can be drawn from them, Plaintiffs did not allege a ground on which the district court could grant relief under Delaware law. We find no error in the district court's decision.

Affirmed.